FOURNET, Chief Justice.
This case was previously before us on an appeal taken by the defendant, B. Elton Cox, but the bills reserved during his trial were not then considered inasmuch as the-only question presented for determination was the legality of the sentence imposed. Finding he had been sentenced within twenty-four hours after his conviction, contrary to the provisions of R.S. IS :521, the sentence was annulled and set aside, the defendant ordered released on bail until such time as legal sentence was imposed, and, in the meanwhile, he was afforded the opportunity to take any procedural steps to which he was entitled during the delay provided by that statute. See, State v. Cox, 243 La. 917, 148 So.2d 600.[1]
This appeal is from the defendant’s conviction of violating Section 14:401 .of the Revised Statutes of 1950 [2] and his sentence thereunder to “pay a fine of $5,000 and to be confined in the parish jail for one year, or in default of the payment of said fine to be imprisoned one year additional, this sentence to run consecutively with” the sentences that day imposed under two other convictions that were affirmed by this court in a decision handed down June 28, 1963. State v. Cox, La., 156 So.2d 448. The defendant in this case, as in the companion cases, is relying for the reversal of his conviction and sentence on five Bills of Exceptions reserved and perfected during the trial, although in the record they are not numbered and considered in the order in which they were reserved.[3]
These three charges, as well as a charge of criminal conspiracy under R.S. 14:26 of which this defendant was exonerated by the trial judge, grew out of the same incident and were, by agreement, consolidated for trial, the evidence adduced at that time being made applicable to all. The basic attack on the legality of the conviction is, in essence, identical in all three cases, the only material difference being the facts and contentions specifically applicable to the charges under the statute involved in each.
In considering these companion cases we found it difficult, as we do here, to answer the arguments of defense counsel without a great deal of duplication and repetition, particularly since the last two bills include the contentions raised in the first three with the usual additional assertion there is no *174 evidence to support the conviction; hence, in order to avoid such repetition and duplication, we adopt the four basic causes assigned by the accused for the reversal of his conviction and sentence as succinctly stated in the opinion in State v. Cox, La., 156 So.2d 448:
“First, it is asserted that the specific laws under which he was charged, tried and convicted * * * are unconstitutional in their application, for the conviction thereunder infringes upon the defendant’s right of free speech protected by the First Amendment of the United States Constitution which the States cannot deny its citizens because of the due process and equal protection clauses of the Fourteenth Amendment of the Constitution of the United States.
“Second, the claim is made that these laws and the bills of information are too vague and general and hence violate the due process and equal protection clauses of the Fourteenth Amendment.
“Third, it is contended that Cox’s trial and conviction were violative of the Fourteenth Amendment for there was no evidence tending to prove the crime charged.
“Fourth, it is contended that the segregated conditions in the courtroom during the trial denied Cox a fair trial in violation of the Sixth and Fourteenth Amendments.”
The argument by defense counsel in the case at bar is also almost identical with that presented in the companion cases, both orally and in brief, and, like the Bills of Exceptions, are not only lengthy and repetitious, but, when properly analyzed, as we found in these cases (156 So.2d 448), basically unsound in that they are without foundation in fact or in law.
Defendant’s first contention is that R.S. 14:401 — prohibiting any form of demonstration in or near a building housing a court of the State of Louisiana, or in or near a building or residence occupied or used by a judge, juror, witness, or court officer, with the intent of interfering with the administration of justice, or with the intent of influencing such judge, juror, witness, or court officer in the proper discharge of his duties, under which statute the defendant was convicted — is unconstitutional in its application in this case.
While defense counsel concede that interfering with the administration of justice is illegal, as is also the influencing of a judge, juror, witness, or court officer in the proper discharge of his duties, it is contended that if the statute is construed to convict him for demonstrating with his followers in front of the East Baton Rouge Parish courthouse, it is unconstitutional in that it deprives him of his right to peacefully assemble and speak freely, as guaranteed by the First Amendment to the Constitution of the United States; further, that in denying him these rights, it also violates the equal protection and due process clauses of the Fourteenth Amendment to the federal constitution.
In considering similar contentions urged in the two companion cases, we recognized, as did the court below, that under decisions of the Supreme Court of the United States the freedoms guaranteed individuals under the First Amendment are protected by the Fourteenth Amendment from invasion by the states, citing a number of authorities whereby this country’s highest court established this rule in the jurisprudence. But we also pointed out that the United States Supreme Court has recognized that the right of freedom of speech and of the press is not absolute, and held that a state may, by general and non-discriminatory legislation, regulate the exercise of that freedom under its police power. Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213.
Unquestionably these rights, freedoms, or privileges of peaceful assembly and of *175 expression and discussion — however they may be considered — as well as the impartial administration of justice that is guaranteed under the Sixth Amendment to the Constitution of the United States, are all vital and important to the concepts on which this nation was founded. To paraphrase Mr. Justice Frankfurter in his concurring opinion in Pennekamp v. Florida, the claims with which we are faced are not those of right and wrong, but of two rights, each highly important to the well-being of society, the core of the problem being to arrive at a proper balance between basic conditions of our constitutional republic— freedom of utterance and peaceful assembly on the one hand, and the proper and impartial administration of justice on the other, and since the latter is one of the chief tests of the true concepts of our constitutional government, it should not be made unduly difficult by irresponsible actions.
In his excellent dissertation on the subject matter, which we adopt as based on sound reasoning and unassailable logic, Justice Frankfurter continues: “Without a free press there can be no free society. Freedom of the press, however, is not an end in itself but a means to the end of a free society. The scope and nature of the constitutional protection of freedom of speech must he viewed in that light and in that light applied. The independence of the judiciary is no less a means to the end of a free society, and the proper functioning of an independent judiciary puts the freedom of the press in its proper perspective. For the judiciary cannot function properly if what the press does is reasonably calculated to disturb the judicial judgment in its duty and capacity to act solely on the basis of what is before the court. A judiciary is not independent unless courts of justice are enabled to administer law by absence of pressure from without, whether exerted through the blandishments of reward or the menace of disfavor. * * * A free press is not preferred to an independent judiciary, nor an independent judiciary to a free press. Neither has primacy over the other; both are indispensable to a free society. The freedom of the press in itself presupposes an independent judiciary through which that freedom (whether of utterance, expression, speech, or peaceful assembly) may, if necessary, be vindicated. And one of the potent means for assuring judges their independence is a free press.” Pennekamp v. Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295. (The emphasis and language within brackets has been supplied.)
We think it proper to mention here and now that R.S. 14:401 was not, as contended by defense counsel and urged in two of the bills reserved (to the denial of a motion for a new trial and one in arrest of judgment), adopted by the Louisiana legislature "for the specific purpose and intent to implement and further the state’s policy of enforced segregation of races.” Instead, it w.as almost a duplicate of an act introduced in Congress in 1949 (Senate Bill No. 1681 and House Bill No. 3766) condemning picketing, parading, and demonstrations in the environs of federal courts, and passed in 1950 with the full support and approval of the American Bar Association for the reason that such conduct in the immediate vicinity of a building or residence housing a court of court officer was anathema to our concepts of justice according to law. The only difference in the federal statute (18 USCA 1507) and our Act No. 177 of 1950 (now R.S. 14:401), as reflected by the wording of our statute as set out in Footnote No. 2, is that in place of the words “in or near a building housing a court of the United States,” our legislature substituted the words “in or near a building housing a court of the State of Louisiana.”
The legislative history of the federal act on which ours was patterned discloses it was passed because of picketing conducted by large crowds outside of a federal district court building in Los Angeles, but, primarily, as the result of the disgraceful picketing and demonstrations in, *176 around, and near a federal building in New York housing, among other courts, the one in which Judge Harold R. Medina was — for a period in excess of 9 months in 1949 — endeavoring to conduct with some semblance of order the trial of 10 of the top leaders of the communist party in the United States, despite the attempt of followers of this philosophy to turn the trial into a travesty of justice by insults, jeers, and harassments through printed signs, calls, loudspeakers, and other methods of persecution heaped upon Judge Medina and court officers in an effort to intimidate the Judge in particular in the proper and impartial trial of that case. It is significant to note, however, that the statute in its operation is not limited to any particular group or person. It applies alike to all. And although we can find no other decision of any court in which the constitutionality of this and like statutes have, heretofore, been assailed, we now hold that R.S. 14 -.401 is constitutional and was legally enacted under the police power with which this state is endowed .to insure the orderly and impartial administration of justice.
The contention that the statute itself, as well as the Bill of Information, are too vague and uncertain to inform the defendant of the nature of the charge against him, as required by Section 10 of Article I of the Constitution of Louisiana; R.S. 15:227; and the Sixth Amendment to the Constitution of the United States, is without merit. As shown above, the mischief sought to be denounced by the statute is as clear as the English language can make it, and since, in drawing" the Bill of Information, the district attorney not only tracked the language of the statute itself, but gave such additional facts and circumstances as were necessary to inform the defendant of the nature of the charge against him and also furnish the basis for a plea of former jeopardy, or autrefois acquit, in the event another charge covering this same incident was ever returned against him, it fully complies with all pertinent constitutional and statutory requirements. The Fifth Amendment to the Constitution of the United States ; Section 9 of Article I of the Constitution of Louisiana; R.S. 15:274-283; State v. Straughan, 229 La. 1036, 87 So.2d 523; State v. Scheler, 243 La. 443, 144 So.2d 389, and the authorities therein cited.
Any additional information thought necessary for the defense of Cox was available to counsel through the means of a Bill of Particulars. However, in resorting to this by motion, counsel only re quested that the state advise “whether a: not the defendant, in any manner, threatened or intimidated any Judge, witness and/or Court Officer in the discharge of their respective duties, and, if so, give the names and addresses of the Judges, witnesses and/ or Court Officers allegedly so threatened or intimidated. Also, state how, when and where the threats and intimidations were made, if any.” The second bill was reserved when the trial judge maintained the assertion of the district attorney in his answer that this information was neither relevant nor material for the trial of defendant’s case, and in this court counsel has not shown either orally or in brief (1) in what respect the lower court erred by such ruling, (2) that this information was necessary or relevant under the statute, or (3) that such information was necessary for his defense.
The statute does not make threats or intimidations ingredients or elements of the mischief sought to be prohibited. The sole object is, as previously stated, to make the courts secure from undue interference or harassment by parades, picketing, and demonstrations in or near a building where courts in which the due administration of justice is dispensed are housed, or in or near the residences of officers of such courts.
The contention that there was no evidence tending to prove the criminal charge against the defendant also lacks substance. The jurisdiction of this court *177 in criminal matters is limited to questions of law alone under Section 10 of Article VII of the Constitution of Louisiana. And although there are decisions of this court recognizing that where there is no evidence at all to support the establishment of an essential element of the crime charged a question of law that we may review is presented (State v. Di Vincenti, 232 La. 13, 93 So.2d 676; State v. La Borde, 234 La. 28, 99 So.2d 11; and State v. Bueche, 243 La. 160, 142 So.2d 381, as well as the authorities therein cited), where there is some evidence to sustain the conviction the sufficiency thereof is a matter that lies within the exclusive province of the trial judge and/or jury, and is not reviewable by this court. State v. Brazzel, 229 La. 1091, 87 So.2d 609; State v. Domino, 234 La. 950, 102 So.2d 227; and State v. Copling, 242 La. 199, 135 So.2d 271, as well as the authorities therein cited.
In our opinion there is ample evidence to sustain the conviction in this case. The record of the testimony (made a part in its entirety by defense motions for a new trial and in arrest of judgment) discloses that according to the estimate of Cox himself between 1,500 and 3,800 colored people congregated in mass formation a couple of blocks from the courthouse on December 15, 1961. This was not only the largest mass grouping of any people in that or the downtown Baton Rouge area within the memory of any of the witnesses, but was composed largely of students from Southern University, a state university for colored people located a few miles north of Baton Rouge, that had absented themselves from school on that day in order to participate in this demonstration. All were admittedly well trained and indoctrinated and subject to any desired activity required by Cox by so simple a signal as the snapping of his fingers.
This large mass of demonstrators was met by local law enforcement officers, and, when questioned, Cox informed them they were preparing to move on the courthouse in protest against the incarceration (on the fourth floor of that building) of some 23 colored people who had been “illegally” arrested the day previous; whereupon Cox was informed this would avail him and his followers nothing, the proper remedy being to resort to the courts since only there could it be decided whether these people had, indeed, been “illegally” arrested.[4] And despite the fact Cox told the officers he and the demonstrators were going to the courthouse anyway and would there peacefully' for a few minutes by singing a hymn and patriotic song, praying, and pledging allegiance to the flag, upon arrival across the street from the front of the courthouse, and at a signal from Cox, the demonstrators immediately pulled from beneath their coats theretofore hidden placards and signs with shouts and yells that interspersed the singing and other parts of the purported “program,” with the result that, in return, those in the jail answered by yelling, screaming, singing, and banging on the walls and doors of the cells in which they were lodged on that side of the building. Cox added to the situation that had by then reached a high pitch of emotional tension by making an “inflammatory” speech, causing some of the officers to feel this now disorderly and seething mob intended to storm the courthouse and liberate the 23 people there incarcerated, and that a riot was inevitable.
The Sheriff, sensing the seriousness of this explosive situation, by means of a loudspeaker ordered the demonstrators to move on. However, Cox, and on his instruction the group, openly defied this command and continued the “fiery” and “frenzied” demonstration, in which they were *178 still being joined by the 23 people incarcerated in the building, despite a second admonition by the Sheriff. It was only by the use of tear gas that the Sheriff, his deputies, and other law enforcement officers (about 80 in all) were able to disperse the group. The trial judge who presided over these proceedings against Cox — and who, with one or more of the other three judges having chambers in this building in which they had been holding court since early in September, would eventually be required to determine in a proper trial whether the incarcerated people had been “illegally” arrested — stated in his reasons for judgment that he was so “fearful” and “apprehensive” of the outcome of this demonstration by such a large mass of people in the area of the courthouse he was, in fact, intimidated, and, upon learning the demonstration was imminent, closed his office and left the building1.
These facts belie defense argument that by his conviction Cox and his followers were denied the right to “peacefully” assemble as guaranteed by the First and Fourteenth Amendments to the federal constitution.
Moreover, while the courts have recognized that picketing is an exercise of a form of free speech that is protected by these constitutional shields, this sweeping analogy as first enunciated by the United States Supreme Court in the case of Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, has since been greatly refined and restricted. For example, this high court in Hughes v. Superior Court of State of California, 339 U.S. 460, 70 S.Ct. 718, 721, 94 L.Ed. 985, pointed out that “ * * * while picketing is a mode of communication it is inseparably something more and different * * * fsince it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated.’ * * * the very purpose of a picket line is to exert influences, and it produces consequences, different from other modes of communication. * * * It has been amply recognized that picketing, not being the equivalent of speech as a matter of fact, is not its inevitable legal equivalent. Picketing is not beyond the control of a State if the manner in which picketing is conducted or the purpose which it seeks to effectuate gives ground for its disallowance. * * * ‘A state is not required to tolerate in all places and all circumstances even peaceful picketing * * ” in addition, mass picketing is not only reprobated — particularly where it interferes with and hampers others in the orderly discharge of their duties and their right to be where they are in connection with them — but picketing that is not peaceful is prohibited. See the annotation on this subject in 32 ALR 2d 1026, particularly the section No. 6 on page 1036, as well as the supplements thereto. (The emphasis has been supplied.)
From the foregoing it is manifest that the view of the incident as now contended by Cox bears no relation whatever to the established facts disclosing that between 1,500 and 3,800 people marched “en masse” against the halls of justice and acted near such halls in a manner calculated to interfere with the orderly administration of justice. As stated in our decision in the companion cases, “These demonstrators, like other citizens, must confine their exercise of constitutional freedom within lawfully regulated limits of those freedoms.” Or, as Judge Learned Hand put it in upholding the conviction of the 10 communist leaders tried before Judge Medina, “Nobody doubts that, when the leader of a mob already ripe for riot gives the word to start, his utterance is not protected by the Amendment.” See, United States v. Dennis, 2 Cir., 183 F.2d 201.
The final error complained of in this case — that the spectators in the courtroom in which Cox was tried were segre *179 gated, thus denying him a fair trial m violation of the Sixth Amendment to the federal constitution, and the equal protection and due process clauses of the Fourteenth — was adjudicated adversely to the defendant in our decision in the companion cases.
Counsel do not claim that Cox did not receive a fair and impartial trial in accordance with the accepted rules and regulations fixed for the orderly trial of cases in the courts of this state, as required by our constitution and statutes, or point out in what manner he was prejudiced by the separation of the spectators in the courtroom where he was tried. Instead, it is contended that the constitutional rights of “these spectators” were violated during the process of his trial, and it is his right to assert the denial of the rights of these people thus purportedly occurring.
One need only review the record in this case to readily discern the defendant received a fair and impartial trial, being given every consideration and protection afforded all persons accused of crimes under our constitution and laws by a judge who acted throughout with great patience and forebearance in an effort to maintain a reasonable semblace of order in the courtroom during the trial, as well as to accommodate the colored spectators, even authorizing the use by them of all seats not then occupied by the white people. Finally, on the third day of the trial, he went so far as to have an officer of the court count the number of seats still vacant and then go into the corridors outside the courtroom and inform those congregated there of their availability. Nevertheless, the trial continued with many still remaining vacant.
To hold, as contended by Cox, that his conviction is a nullity merely because of the segregated condition of the courtroom, would, of necessity, make every conviction of an accused during the past years in all of the courts of the state, and regardless of race, nullities, with the result that everyone now confined in our penal institutions would be entitled to have his conviction set aside, and these thousands of criminals would then be turned loose on the people of the state.
For the reasons assigned, the conviction and sentence are affirmed.

. For the same reason the sentences originally imposed following his conviction under two other statutes were set aside on writs granted to review this action by the trial judge. See, State ex rel. Cox v. Clemmons, 243 La. 264, 142 So.2d 794.

. R.S. 14:401 is in that section of our criminal code dealing with “Offenses Affecting Law Enforcement.” Its pertinent portion provides: “Whoever, with the intent of interfering with, obstructing, ■or impeding the administration of justice, ■or with the intent of influencing any judge, juror, witness, or court officer, in the discharge of his duty pickets or parades in or near a building housing a •court of the State of Louisiana, or in or near a building or residence occupied or used by such judge, juror, witness, or court officer, or with such latent uses any sound-truck or similar device or resorts to any other demonstration in or near any such building or residence, shall be fined not more than five thousand dollars or imprisoned not more than one year, or both.”

.The 1st was reserved when the trial judge overruled the motion to quash the information; the 2nd when he ruled the state’s answer to a request for a Bill of Particulars was adequate; the 3rd is levelled at a purported failure to secure an impartial trial because of the segregated character of the courtroom; and the 4th and 5th, respectively, when the judge overruled motions for a new trial and in arrest of judgment.

. It does not appear from the record that any attempt whatsoever had been made to secure the release of these 23 persons on bail, or by resort to the available writ of habeas corpus.