Rev. B. Elton COX, Appellant,

v.

STATE OF LOUISIANA, Appellee.

No. 22657.

United States Court of Appeals
Fifth Circuit.

June·29, 1965.

Nils R. Douglas, New Orleans, La., Murphy W. Bell, Baton Rouge, La., for appellant.

Ralph L. Roy, Asst. Dist. Atty., Baton Rouge, La., for appellee.

Before HUTCHESON, BROWN, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge:

The Reverend B. Elton Cox, defendant in a criminal cause pending in the 19th Judicial District for the Parish of East Baton Rouge, Louisiana, removed the cause to the United States District Court for the Eastern District of Louisiana, Baton Rouge Division. The district court remanded the cause to the state court. Cox applied to this Court for a stay of the remand order pending his appeal of the order. We find that the peti-

tion states a good claim for removal under 28 U.S.C. § 1443(1). We grant the stay.

■ The allegations of the petition for removal must be accepted as true for purposes of determining whether the petition states a good claim for removal. These allegations show a "planned prosecutorial misuse of a [state criminal] statute".[1]

In 1961 Cox, a Negro minister active in the civil rights movement, was arrested the day following a civil rights demonstration in Baton Rouge. The State indicted Cox on a number of charges, one of which was that he had obstructed justice by demonstrating near the courthouse in violation of Louisiana law.[2] LSA-R.S. 14:401. The United States Supreme Court reversed all of the convictions. Cox v. State of Louisiana, 1965, 379 U.S. 559, 575, 85 S.Ct. 476, 486, 13 L.Ed.2d 487, 498.

As the petition sets forth, in 1965, shortly after the Supreme Court decided Cox v. State of Louisiana the district attorney for the Parish of East Baton Rouge, Louisiana, filed in the original proceeding a new bill of information against Cox, this time charging him with "*attempting*" to obstruct justice. The bill is based on the identical conduct that in 1961 led to the arrest and conviction of Cox on the charge of "obstructing justice".

In Cox v. State of Louisiana, the Supreme Court set aside this conviction on the ground that it violated due process of law. The Court found that the "record here clearly shows that the [police and city] officials * * * gave permission for the demonstration to take place across the street from the courthouse". The Court stated emphatically that nothing in its opinion should be "interpreted as sanctioning riotous conduct in any form". There "can be no question that a State has a legitimate interest in protecting its judicial system from the pressures which picketing near a courthouse

---

1. So Justice White describes another groundless prosecution—Dombrowski v. Pfister, 1965, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22. Cameron v. Johnson, 1965, 381 U.S. 741, 755, 85 S.Ct. 1751, 1759, 14 L.Ed.2d 715, 721. (Dissenting opinion).

2. The Reverend B. Elton Cox led a civil rights demonstration in Baton Rouge in December 1961 to protest the arrest of 23 students who had picketed stores maintaining segregated lunch counters. In Cox v. State of Louisiana, 1965, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487, the Supreme Court described the demonstration as "an orderly and peaceful march" to a street across from the courthouse in Baton Rouge. The Court noted that the city officials gave permission for the demonstration. When Cox started to make a speech, however, the Chief of Police, considering the speech inflammatory, ordered the demonstrators to disperse. When the crowd did not disperse quickly enough, the police exploded tear gas bombs. The Supreme Court noted that the demonstration was orderly until the police exploded the tear gas bombs. None of the demonstrators were arrested at the time but the next day Cox was arrested and charged with criminal conspiracy, disturbing the peace, obstruct-

ing public passages, picketing before a courthouse, and obstructing the administration of justice.

Cox was tried before a judge without a jury. He was convicted of all but the criminal conspiracy charge. The Louisiana Supreme Court affirmed. 245 La. 303, 158 So.2d 172. The United States Supreme Court set aside the convictions, principally on the ground that the convictions infringed Cox's rights of free speech and assembly. The Court held that Cox did not, in fact, engage in any conduct which the State could prohibit as a breach of the peace. Cox v. State of Louisiana, 1965, 379 U.S. 559, 85 S.Ct. 476, 13 L. Ed.2d 471, 487 (two cases). Second, the breach of peace statute, on its face, was "unconditionally vague in its overly broad scope." As to the conviction for obstructing public passages, the Court held that an appropriate statute giving officials a limited discretion would have been proper, but it was "clearly unconstitutional" to allow "unfettered discretion in local officials". The Court held that the convictions for obstructing justice violated the due process clause because the "uncontradicted evidence" showed that the city officials were guilty of "an indefensible sort of entrapment" in that they told the demonstrators that they could meet where they did.

might create." But, on the merits, "under circumstances such as those present in this case, appellant's conviction cannot be sustained"; the police and city officials were guilty of "an indefensible sort of entrapment."

In the teeth of this holding, the district attorney is renewing the charges against Cox. The State now seeks to prosecute the petitioner for the alleged crime of *"attempting"* to do what the Supreme Court, *on the merits*, decided was not a violation of the law.

The second prosecution is without any hope of success. The district attorney's transparent purpose is to harass and punish the petitioner for his leadership in the civil rights movement, and to deter him and others from exercising rights of free speech and assembly in Louisiana—in this instance, by advocating integration of public accommodations.

A civil complaint asserting such an abuse of the prosecutorial function would state a claim under the Civil Rights Act, 42 U.S.C. § 1983 and justify injunctive relief. Dombrowski v. Pfister, 1965, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22.[3] This is not a *Douglas v. City of Jeannette, Stefanelli,* or *Cleary v. Bolger* situation.[4] Here the State, through the parish district attorney, under the guise of protecting the administration of justice, is challenging the Nation on a national policy expressed in the Constitution, carried out by Congress, and validated by the Supreme Court.

■ The general principle, basic to American Federalism, that United States courts usually should refrain from interfering with state courts' enforcing local laws is unassailable. But the sharp edge of the Supremacy Clause cuts across all such generalizations. When a State, under the pretext of preserving law and order uses local laws, valid on their face, to harass and punish citizens for the exercise of their constitutional rights or federally protected statutory rights, the general principle must yield to the exception: the federal system is imperiled.

This Court, in many different contexts, has faced up to the reality that a narrowly drawn, non-discriminatory, apparently constitutional criminal law, or other local law, or rule of court, may have been designed to provide a subtle means of discrimination or may be subverted by being unconstitutionally applied. Prompt access to the federal court may be the only relief that will make meaningful to the individual the rights placed in jeopardy.[5] Moreover, the effect of arrest and prosecution and perhaps a long sentence unfitted to the crime will extend

3. Justice White, commenting on Dombrowski, has said: "Where threats of enforcement are without any expectation of conviction and are 'part of a plan to employ arrests, seizures, and threats of prosecution under color of statutes to harass,' it is obvious that defense in a state criminal prosecution will not suffice to avoid irreparable injury. The very prosecution is said to be a part of the unconstitutional scheme and the scheme, including future use of the statutes, are quite irrelevant to the prosecution in the state courts." Cameron v. Johnson, 1965, per curiam, 381 U.S. 741, 755, 85 S.Ct. 1751, 1759, 14 L.Ed.2d 715, 721 (dissenting opinion). Justice Black, who also dissented, observed: "Dombrowski also indicates to me that there might be cases in which state or federal officers, acting under color of a law which is valid, could be enjoined from engaging in unlawful conduct which deprives persons of their federally guaranteed statutory or constitutional rights. Compare 17 Stat. 13, 42 U.S.C. § 1983 (1958 ed.)." *Id.,* 381 U.S. 749, 85 S.Ct. 1755–1756, 14 L.Ed. 2d 718.

4. Douglas v. City of Jeannette, Pa., 1943, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324; Stefanelli v. Minard, 1951, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138; Cleary v. Bolger, 1963, 371 U.S. 392, 83 S.Ct. 385, 9 L.Ed.2d 390.

5. The Jackson Freedom Riders spent four years in state courts attempting to overturn their convictions, despite the fact that the Supreme Court had previously declared the arrests patently unconstitutional. Bailey v. Patterson, 1962, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512.

far beyond the individual defendant.[6] In these circumstances there is no basis for the application of comity as a principle of federalism.[7] And no reason for a court to be bound by obsolete standards for determining discrimination prevailing at the time the early removal cases were decided.[8]

In the context of the removal statute, Section 1443, two recent decisions of this Court are squarely in point and control the instant case, Rachel v. State of Georgia, 5 Cir. 1965, 342 F.2d 336, and Peacock v. City of Greenwood, 5 Cir. 1965, 347 F.2d 679 (June 22, 1965).

Rachel involved prosecutions of sit-in demonstrators under a Georgia anti-trespass statute. The statue was valid on its face and there was no showing that the defendant would not have a fair trial in the Georgia courts. Relying on Hamm v. City of Rock Hill, 1964, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300, we allowed removal under Section 1443(1) on the ground that the effect of prosecuting the demonstrators under the statute would be to deny their civil rights, contrary to a congressional statute, the Civil Rights Act of 1964. Their conduct was federally protected. Judge Tuttle, for the Court, said:

"Congress, while carving out rights and immunities in the area of civil rights, has provided a jurisdictional basis for efficiently and appropriately protecting those rights and im-

munities in a federal forum. The provision of this protective forum is not limited by the States' obligation, under the Supremacy Clause, to protect federally guaranteed civil rights as zealously as would a federal court. That there is such an obligation on State tribunals is true, and vital, but it is irrelevant here. Theoretically, there is no need for any federal jurisdiction at all—except that of the Supreme Court—because State courts are required to protect federally created rights. Nevertheless, the power of Congress to provide a federal forum also to protect such rights is undoubted. Such power was exercised in enacting § 1443(1)."

*Peacock* extended the *Rachel* principle to a state statute discriminatorily applied, contrary to the United States Constitution. In *Peacock* the defendants were charged with obstructing public streets in violation of a narrowly drawn Mississippi statute valid on its face. We held that the petition stated a good claim for removal on the ground that if the statute were being applied as alleged, convictions under the statute would violate the equal protection clause. Judge Bell, for the Court, said:

"The rationale of *Rachel* is inescapably applicable here, since both cases involve the denial of equal rights through statutory applica-

6. In United States v. Wood, 5 Cir. 1961, 295 F.2d 772, cert. den'd 369 U.S. 850, 82 S.Ct. 933, 8 L.Ed.2d 9, a leader in a Negro voters registration campaign was arrested, without cause, for breach of the peace. We asked, "The question then arises how the arrest and prosecution of Hardy can irreparably injure these other citizens [potential Negro voters in the county], if we must assume that Hardy will receive a fair trial and that his acquittal is a possible result". We answered, "that the prosecution of Hardy, regardless of outcome [favorable to Hardy] will effectively intimidate Negroes [generally] in the exercise of their right to vote in violation of 42 U.S.C. § 1971". We pointed out that the "legislative history of section 1971 would indicate that Congress contemplated just such activ-

ity as is here alleged—where the state criminal processes are used as instruments for the deprivation of constitutional rights." 295 F.2d 781.

7. See Dilworth v. Riner, 5 Cir. 1965, 343 F.2d 226, and cases cited.

8. For example, Commonwealth of Kentucky v. Powers, 1906, 201 U.S. 1, 26 S.Ct. 387, 50 L.Ed. 633, limiting Section 1443(1) to cases where the denial of equal rights appeared on the face of a state constitution or statute. See discussion in Rachel and Peacock. Cf. People of State of New York v. Galamison, 2 Cir. 1965, 342 F.2d 255, cert. den'd 380 U.S. 977, 85 S.Ct. 1342, 14 L.Ed.2d 272, dealing, however, primarily with section 1443(2).

tion, rather than through some infirmity appearing on the face of the state statute. \* \* \* In short, we do not read [Kentucky v. Powers and other early] cases as establishing that the denial of equal civil rights must appear on the face of the state constitution or statute rather than in its application where the alleged denial of rights, as here, had its inception in the arrest and charge. They dealt only with the systematic exclusion question, a question which in turn goes to the very heart of the state judicial process, and federalism may have indicated that the remedy in such situations in the first instance should be left to the state courts. We would not expand the teaching of these cases to include state denials of equal civil rights through the unconstitutional application of a statute in situations which are not a part of the state judicial system but which, on the contrary, arise in the administration of a statute in the arresting and charging process. \* \* \* We therefore hold that a good claim for removal under § 1443 (1) is stated by allegations *that a state statute has been applied prior to trial so as to deprive an accused of his equal civil rights in that the arrest and charge under the statute were effected for reasons of racial discrimination.* \* \* \* However, we deal here only with what allegations are sufficient to prevent remand without a hearing. \* \* \* It follows that the District Court erred in remanding these cases to the state court without a hearing."

■ Cox's petition presents a strong case for removal. Once Cox was over the hurdle of the city and police officials' approval of the location of the demonstration, Cox's conduct was protected by the Civil Rights Act, as was Rachel's conduct, and by the equal protection clause of the Constitution, as was Peacock's conduct. What makes Cox's petition particularly strong is that apparently the parish district attorney is deliberately attempting to frustrate the protective mandate of the United States Supreme Court. This case therefore presents a sharper challenge to the Supremacy Clause than *Rachel* and *Peacock* presented. In addition, in the Georgia cases there was no indication of a prosecution in bad faith and no assertion that the defendants would be unable, as Cox alleges, to vindicate their rights in the state courts.[9]

There is a common denominator in *Rachel*, *Peacock*, and *Cox*: the defend-

---

9. The petitioner alleges:

"Petitioner is unable to enforce his federal rights in the state courts of Louisiana and particularly in the 19th Judicial District Court, because those courts are hostile to petitioner by reason of race and his civil rights' activity and by reason of the commitment of those courts to enforce Louisiana's policy of racial discrimination. In the District Court for East Baton Rouge Parish where Petitioner will be tried:

(a) District Court Judges are elected for terms of four years at elections at which Negroes have been systematically denied the right to vote by reason of race in violation of the Fifteenth Amendment.

(b) Negroes are systematically excluded from the juries by reason of race.

(c) Criminal defendants charged with offenses arising out of demonstrations and other exercise of their equal civil rights have usually been held to answer under excessive and exorbitant bail and if convicted maximum imposition of sentence is imposed.

(d) Negro defendants, Negro witnesses and Negro attorneys are addressed by their first names, as a mark of contempt and racial discrimination in violation of the Equal Protection Clause.

(e) The Court sits in a community which is hostile to and inflamed against Negroes and, in particular, hostile to and inflamed against persons like petitioner who actively exercise his federal constitutional rights by working in a lawful and peaceful manner to achieve the equal rights of Negroes and of all persons within the State of Louisiana and the United States."

ants, as a result of their actions in advocating civil rights, are being prosecuted under statutes, valid on their face, for conduct protected by federal constitutional guarantees or by federal statutes or by both constitutional and statutory guarantees.[10] In essence, these guarantees rest on *national* citizenship, as opposed to *state* citizenship, not expressly recognized until the three Civil War amendments.

10. See Amsterdam, Criminal Prosecutions Affecting Federally Guaranteed Civil Rights: Federal Removal and Habeas

In *Rachel*, *Peacock*, and *Cox*, and in similar cases, there is no federal invasion of states' rights. Instead, there is rightful federal interposition under the Supremacy Clause of the Constitution to protect the individual citizen against state invasion of federal rights.

HUTCHESON, Circuit Judge (concurring specially):

I concur in the result.

Corpus Jurisdiction to Abort State Court Trial, 113 U. of Pa.L.Rev. 793 (1965).