The Reverend John Earl **CAMERON** et al., Petitioners,

v.

Honorable Paul B. **JOHNSON** et al., Respondents.

Civ. A. No. 1891(H).

United States District Court
S. D. Mississippi,
Hattiesburg Division.

Dec. 24, 1966.

Rives, Circuit Judge, dissented.

Benjamin E. Smith, Smith, Waltzer, Jones & Peebles, New Orleans, La., L. H. Rosenthal, Jackson, Miss., for petitioners.

Joe T. Patterson, Atty. Gen. of Mississippi, Will S. Wells, Asst. Atty. Gen., Jackson, Miss., for respondents.

Before RIVES and COLEMAN, Circuit Judges, and COX, District Judge.

COLEMAN, Circuit Judge.

This is the second time this case has been before this Court for hearing and decision. Invoking Title 42, U.S.C. §§ 1971, 1983, and 1985, the plaintiffs originally filed their complaint on April 13, 1964, against the governor of Mississippi and various officials in Forrest County, Mississippi. They sought a declaratory judgment and injunction, attacking the constitutionality of House Bill No. 546 of the Laws of Mississippi of 1964.[1] By appropriate amendments, the suit became a class action and plaintiffs seek to enjoin the prosecutions already begun as well as the future enforcement of the statute.

The first hearing was before Circuit Judge Rives and District Judges Mize and Cox. Upon full hearing, relief was denied. The findings of fact, conclusions of law, and opinion of the Court are reported at 244 F.Supp. 846 (1964).

Judge Rives dissented, being of the view that it would be "difficult to conceive of a statute drawn in broader or more vague and sweeping terms than that here under attack. In my opinion, the statute is so clearly unconstitutional that this case is hardly 'one required * * * to be heard and determined by a district court of three judges.' [citing authorities]." Moreover, he was of the opinion that the doctrine of abstention should not have been invoked and that the plaintiffs were clearly entitled to an injunction.

Upon appeal to the Supreme Court, the judgment was vacated, 381 U.S. 741, 85 S.Ct. 1751, 14 L.Ed.2d 715 (June 7, 1965). The case was remanded "for reconsideration in the light of Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, [14 L.Ed.2d 22]." We were given the following specific directions:

"On remand, the District Court should first consider whether 28 U.S.C. § 2283 (1958 ed.) bars a federal injunction in this case, see 380 U.S., at 484, n. 2, 85 S.Ct. [1116], at 1119. If § 2283 is not a bar, the court should then determine whether relief is proper in light of the criteria set forth in Dombrowski."

Mr. Justices Black, Harlan, Stewart, and White dissented, 381 U.S., beginning at p. 742 and concluding at p. 759, 85 S.Ct. 1752–1761.

Upon the death of Judge Mize, the present writer was designated to serve in his stead.

In the meantime, the criminal prosecutions here sought to be enjoined were removed from the State Court to the United States District Court for the Southern District of Mississippi. That Court remanded the cases (approximately 48 in number). This was appealed. The United States Court of Appeals for the

1. HOUSE BILL NO. 546

AN ACT to prohibit the unlawful picketing of state buildings, courthouses, public streets, and sidewalks.

Be it enacted by the legislature of the state of Mississippi:

Section 1. It shall be unlawful for any person, singly or in concert with others, to engage in picketing or mass demonstrations in such a manner as to obstruct or [unreasonably] interfere with free ingress or egress to and from any public premises, State property, county or municipal courthouses, city halls, office buildings, jails, or other public buildings or property owned by the State of Mississippi or any county or municipal government located therein or with the transaction of public business or administration of justice therein or thereon conducted or so as to obstruct or [unreasonably] interfere with free use of public streets, sidewalks or other public ways adjacent or contiguous thereto.

Section 2. Any person guilty of violating this act shall be deemed guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than Five Hundred Dollars ($500.00), or imprisoned in jail not more than six (6) months, or both such fine and imprisonment.

Section 3. This act shall take effect and be in force from and after its passage.

NOTE: The word "unreasonably" in brackets in the text was added by amendment to the Statute on July 9th, 1964.

House Bill 546 became Chapter 343 of the Laws of 1964, later codified as § 2318.5 of the Mississippi Code of 1942, annotated.

Fifth Circuit affirmed the remand, sub. nom. Hartfield et al. v. State of Mississippi, 363 F.2d 869 (July 21, 1966), the Court being of the opinion that the order should be sustained on the authority of City of Greenwood v. Peacock, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944.

On September 23, 1966, this Court stayed the criminal prosecutions in the State courts until such time as the instant proceedings are finally heard and determined.

In the meantime, on October 15, 1965, we heard further proof and oral arguments on behalf of the parties. Later, the plaintiff and the defendants filed written briefs.

We now come to a consideration of the questions which the Supreme Court directed this Court to answer.

I

FACTS

Before giving our views of what the answers should be, we allude briefly to the facts. We do not disturb, of course, the findings of fact already made by the Court as they appear in 244 F.Supp. at 847.[2] Pursuant to the hearing of October 15, 1965, we supplementally find the following to have been established by the evidence:

These plaintiffs, after arrest on the courthouse grounds, were charged in the State court substantially in the language of the statute. The blocking of the sidewalks and entrances and interfering with the free use of the courthouse sidewalks and entrances was the gravamen of the offense. We do not sit in this proceeding to determine the guilt or innocence of the plaintiffs but it may be said that we are here to determine whether there is substantial cause in law and fact supporting the right of duly constituted state authorities to have these questions of guilt or innocence determined by appropriate criminal prosecution.

In any event, from all the evidence, including testimony of witnesses on the stand, we find that for many days prior to the arrest and prosecution here in question these complainants and others, carrying banners proclaiming their views, marched around the entire courthouse building. The Sheriff, charged by law with the custody of the courthouse and its grounds, requested the leaders to limit their march to the south half of the front of the courthouse and around the narrow concrete walks at the northwest corner of the building, fronting northerly on North Main Street. For many days, the demonstrators honored this request. Then, a larger group appeared and began marching so close together that they blocked certain vital entrances to the courthouse, particularly the entrance to the Cooperative Extension Service, a function in which the United States participates. At last, on April 10, 1964, the Sheriff read the statute to the participants and warned them that if they violated it he would have no choice but to arrest them. Those participating in the picketing conferred among themselves for most of the night, obtained legal advice, and decided to march on the courthouse grounds the next day. We find that there was no harassment, intimidation, or oppression of these complainants in their efforts to exercise their constitutional rights, but they were arrested and they are being prosecuted in good faith for their deliberate violation of that part of the statute which denounces interference with the orderly use of courthouse facilities by all citizens alike.

This brings us face to face with the validity or invalidity of Section 2318.5

2. In summary, at pp. 848 and 849 of 244 F.Supp., the findings were:
  1. There was no evidence that there was a plan or a conspiracy on the part of defendants or in the enactment of the statute to suppress, deter, impede or violate any constitutional right of the plaintiffs to free speech, assembly, to register, to vote, or to demonstrate peacefully and lawfully;
  2. The plaintiffs deliberately and intentionally blocked the sidewalk and one of the entrances to the Courthouse; and
  3. The prosecution for violation of § 2318.5 is in good faith.

of the Mississippi Code, and we consider only the questions which the Supreme Court was of the view that we should consider in determining the fate of this litigation.

## II

■ Does 28 U.S.C.A. § 2283[3] deny this Court the power to enjoin these criminal prosecutions? We think it does.

At the outset, the Supreme Court directed our attention to note 2, 380 U.S. at 484, 85 S.Ct. 1116, 14 L.Ed.2d 22. This was a note to the opinion of the Court in Dombrowski v. Pfister, supra, which will be set out in the margin.[4]

Dombrowski sought injunctive and declaratory relief prior to arrest or prosecution, it being alleged that such was threatened to harass the plaintiffs and discourage them and their supporters from asserting and attempting to vindicate the constitutional rights of Negro citizens of Louisiana. Note 2 at p. 484 of 380 U.S., p. 1119 of 85 S.Ct., contains the following specific language, "this statute [§ 2283] and its predecessors do not preclude injunctions against the

institution of state court proceedings, but only bar stays of suits already instituted". The footnote continued, however, to the effect that it was unnecessary to resolve the question of whether suits under 42 U.S.C. § 1983 (1958 ed.) come under the "expressly authorized" exception to § 2283.

In Hill v. Martin, 296 U.S. 393, at 403, 56 S.Ct. 278 at 282, 80 L.Ed. 293, (1935) the Supreme Court (opinion by Mr. Justice Brandeis) referred to the provisions of this Section, then § 265, as a *prohibition,* saying:

"The prohibition of section 265 is against a stay of 'proceedings in any court of a State.' That term is comprehensive. It includes all steps taken or which may be taken in the state court or by its officers from the institution to the close of the final process. It applies to appellate as well as to original proceedings; and is independent of the doctrine of *res adjudicata.*"

■ Leaving aside any dissertation on "jurisdiction" or "comity", we think the plain language of the statute means

---

3. Section 2283, 28 U.S.C.
  A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments. June 25, 1948, c. 646, 62 Stat. 968.

4. 28 U.S.C. § 2283 (1958 ed.) provides that:
  A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.
  The District Court did not suggest that this statute denied power to issue the injunctions sought. This statute and its predecessors do not preclude injunctions against the institution of state court proceedings, but only bar stays of suits already instituted. See Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714. See generally Warren, Federal and State Court Interference, 43 Harv. L.Rev. 345, 366–378 (1930); Note, Federal Power to Enjoin State Court Proceedings, 74 Harv.L.Rev. 726, 728–729

(1961). Since the grand jury was not convened and indictments were not obtained until after the filing of the complaint, which sought interlocutory as well as permanent relief, no state "proceedings" were pending within the intendment of § 2283. To hold otherwise would mean that any threat of prosecution sufficient to justify equitable intervention would also be a "proceeding" for § 2283. Nor are the subsequently obtained indictments "proceedings" against which injunctive relief is precluded by § 2283. The indictments were obtained only because the District Court erroneously dismissed the complaint and dissolved the temporary restraining order issued by Judge Wisdom in aid of the jurisdiction of the District Court properly invoked by the complaint. We therefore find it unnecessary to resolve the question whether suits under 42 U.S.C. § 1983 (1958 ed.) come under the "expressly authorized" exception to § 2283. Compare Cooper v. Hutchinson, 184 F.2d 119, 124 (C.A.3d Cir. 1950), with Smith v. Village of Lansing, 241 F.2d 856, 859 (C.A. 7th Cir. 1957). See Note, 74 Harv.L. Rev. 726, 738 (1961).

what it says and constitutes a positive direction by Congress which this Court should obey. The 1948 Revisors did not change the mandatory language as above expounded by the Supreme Court.

Since this Court rendered its first decision, the Fourth Circuit Court of Appeals has decided Baines v. City of Danville, 337 F.2d 579, August 10, 1964.

Section 2283 was there thoroughly analyzed. The authorities were exhaustively examined. It was held that the section is a limitation on the exercise of the equity jurisdiction of District Courts. The Court declined to enjoin prosecutions pending for violation of ordinances of the City of Danville. It was held that 42 U.S.C. § 1983 does not create an exception to the anti-injunction statute.

We, therefore, are of the opinion that § 2283 of Title 28, U.S.C., prohibits this Court from enjoining or abating the criminal prosecutions instituted against the plaintiffs prior to the filing of the suit for injunction.

■ We are of the further opinion, following the decision in *Baines*, that § 1983, 42 U.S.C., creates no exception to this anti-injunction statute.

The prayer that this Court enjoin or abate the pending prosecutions will be denied.

■ The matter does not end here, however, for *Baines* held that restraints upon future prosecutions are beyond the reach of § 2283. No doubt this principle is what prompted the second portion of the directions from the Supreme Court, which may here be restated as follows:

> Applying the principles of *Dombrowski*, did State conduct in this case justify declaratory or injunctive relief against further enforcement of the statute?

■ We answer this question in the negative.

We accept as correct the statement of plaintiff's counsel appearing at page seven of his excellent brief that:

*"Dombrowski* sets forth two separate and distinct categories of circumstances in which the exercise of federal equity power to restrain state criminal prosecutions is appropriate. The first * * * relates to situations in which state statutes are challenged on their face as 'overly broad and vague regulations of expression' * * *. [The second] is actually threatened prosecutions under the statute."

The posture of this case necessitates discussion only of the first category.

We therefore deal only with the contentions of plaintiffs that the statute is so broad, vague, indefinite, and lacking in definitely ascertainable standards as to be void on its face.

We think it is as specific and definite as the Florida statute sustained against such an attack in Adderley et al., Petitioners v. State of Florida, 1966, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149. That statute denounced "Every trespass upon the property of another, committed with a malicious and mischievous intent * * * ". The Florida Court defined a malicious act as one done knowingly and wilfully and without any legal justification.

House Bill 546 of the Laws of Mississippi does not prohibit picketing or mass demonstrations on courthouse grounds. The prohibited factor is the obstruction or unreasonable interference with free ingress or egress to and from the courthouse.

In *Adderley*, the Supreme Court expressed the following observations:

> "The sheriff, as jail custodian, had power, as the state courts have here held, to direct that this large crowd of people get off the grounds", and

> "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated", and

> "The United States Constitution does not forbid a State to control the

use of its own property for its own lawful non-discriminatory purpose".

The record shows that these plaintiffs for about three months had been picketing the courthouse and they had not been arrested because they picketed in space which did not interfere with the normal use of courthouse facilities by all citizens alike, regardless of color or other consideration.

April eleventh, however, was another matter. The Legislature passed a law attempting to prescribe some order to these activities, not really interfering with plaintiffs even on courthouse grounds so long as they did not interfere with others. The record shows that these individuals, though "frightened" as they claimed, deliberately came to a contest of wills with the sheriff, who had lawful custody of the premises, who had a duty to enforce the statute, and who had a duty to see that they obeyed it. Plaintiffs knew what they were doing, they knew what the statute proscribed, but they went ahead.

Plaintiffs, in their very able and brilliantly written brief, argue that the addition of the word "unreasonably" to the statute made it even more vague and indefinite, but we disagree. The word "unreasonable" seems to have been well understood by the founders of the Republic when they used it in the Fourth Amendment, where it remains, and is enforced, as it should be, to this day.

■ Plaintiffs also say that the action of City (not County) authorities in permitting the use of the streets for school parades and the like, a practice customarily enjoyed by the community as a part of ordinary community activities, participated in by all races, constitutes selective enforcement of the statute and thus invalidates it. We cannot agree with this argument. We are not here dealing with parades carried on by common consent on the public streets. We here confront picketing on the courthouse grounds in such manner as to interfere with the use of the courthouse by other citizens who had an equal right to its use.

We hold that under all the facts and circumstances of this case the principles announced in *Dombrowski* have not been brought into play, that injunctive or declaratory relief as to future enforcement of the statute is not justified.

■ By way of epilogue, there are other important reasons, in the exercise of judicial discretion in equity, for declining injunctive or declaratory relief in this case. The plaintiffs allege that they were picketing the courthouse grounds for the purpose of obtaining the right to vote and to encourage others to do so. Since this controversy arose, the people of Mississippi, pursuant to Resolutions of the Legislature, in the summer of 1965, went to the polls and overwhelmingly amended the State Constitution to eliminate all literacy tests for voting, except the ability to read and write. By the Voting Rights Act of 1965, Congress eliminated the use of any literacy test in the State of Mississippi during the next five years. Federal Registrars were provided. In South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 883, 15 L.Ed.2d 769, the Supreme Court upheld the validity of this federal legislation. The right of any Mississippi citizen, of lawful age and not a convict of felony, to vote is now beyond all controversy or unrest. Picketing to obtain the vote or to encourage others to do so is a thing of the past.

This opinion shall constitute our Findings of Fact and Conclusions of Law as provided by Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.

An Order may be submitted dismissing the Complaint.

COX, District Judge (specially concurring):

This class action involves forty-eight persons who were being prosecuted for the violation of § 2318.5 Mississippi Code 1942, captioned: "Picketing which interferes with ingress and egress to and from public buildings, premises, streets and sidewalks." The body of the act makes it unlawful "for any person, singularly or in concert with others, to engage

in picketing or mass demonstrations in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any public premise, State property, county or municipal courthouses, city halls, office buildings, jails or other public buildings or property owned by the State of Mississippi, or any county or municipal government located therein, or with the transaction of public business or administration of justice therein or thereon conducted or so as to obstruct or unreasonably interfere with free use of public streets, sidewalks or other public ways adjacent or contiguous thereto [etc.]." These plaintiffs were charged in the state court in the language of the statute with obstructing the sidewalks adjacent to the county courthouse building of Forrest County, Mississippi and with blocking the entrances to such building by walking along such narrow walks so close together as to violate this statute. The plaintiffs' lawyers say that this statute is vulnerable to the "void for vagueness" doctrine. Significantly, not one of the plaintiffs elected to testify that he could not reasonably understand that his conduct was proscribed by that act. It must be and is conclusively presumed that if such had been the facts that at least one of the plaintiffs would have so testified. This statute is attended by one of the strongest known presumptions as to its validity. These plaintiffs well understood that which was proscribed thereby and defiantly persisted in ignoring the request of the sheriff that they desist from walking so close together and that they picket in a lawful fashion. A statute will not be invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language. United States v. National Dairy Products Corporation, 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561. In Jordan v. DeGeorge, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886, this vagueness doctrine was applied to the words "moral turpitude" involved in the Immigration Act of 1917 [8 U.S.C.A. § 155(a)]. The Court said "[i]mpossible

standards of specificity are not required. United States v. Petrillo, 1947, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877. The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. Connally v. General Construction Company, 1926, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322." That was not a criminal statute but the penalty involved was deportation or banishment from the country and the Court applied such doctrine thereto and approved said enactment. In Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 72 S.Ct. 329, 330, 96 L.Ed. 367, it is said: "A criminal statute must be sufficiently definite to give notice of the required conduct to one who would avoid its penalties, and to guide the judge in its application and the lawyer in defending one charged with its violation. But few words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."

In Roth v. United States of America, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, there was involved the question as to the vagueness or not of the Federal Obscenity Statute appearing as 18 U.S. C.A. § 1461. In affirming a conviction, the Court said that many decisions recognize that the terms of obscenity statutes are not precise but said that lack of precision is not itself offensive to the requirements of due process; further saying: " ' * * * [T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured

by common understanding and practices * * *.' United States v. Petrillo, 332 U.S. 1, 7–8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 [supra]. These words, applied according to the proper standard for judging obscenity, already discussed, give adequate warning of the conduct proscribed and mark ' * * * boundaries sufficiently distinct for judges and juries fairly to administer the law * * *.' That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense," citing many cases.

There is nothing in this act or in its enforcement in this case which even remotely relates to impinging upon any First Amendment rights of these plaintiffs. Nobody doubted or questioned or denied the right of these plaintiffs to walk or march or demonstrate as they wished with banners containing protestations of their own choice. But this statute simply made picketing unlawful even for such purpose if it blocked the entrances and impeded or prevented the public its right of ingress and egress to such public building. That is all that is involved in this case. Judge Coleman has properly and correctly answered the questions directed by the Supreme Court of the United States to this Court on its remand of this case; and I concur in that opinion in its entirety.

RIVES, Circuit Judge (dissenting):

This suit was initially brought on April 13, 1964, and through appropriate amendments became a class action by the plaintiffs against the defendants under Rule 23, Fed.R.Civ.P. Plaintiffs sought a declaratory judgment that the Mississippi Anti-Picketing statute was unconstitutional. The Mississippi statute is section 2318.5, Mississippi Code Annotated 1942 (1964 sup.).[1]

Plaintiffs also sought injunctive relief restraining the future enforcement of section 2318.5, as well as the abatement of prosecutions already instituted under the Bill. A three-judge district court composed of Circuit Judge Rives and District Judges Mize (now deceased) and Cox was convened. The suit was submitted on conflicting affidavits, no live testimony having been taken.

On July 11, 1964 the complaint was dismissed by the court. Cameron v. Johnson, 244 F.Supp. 846 (S.D.Miss. 1964). Judge Mize writing for the court held that plaintiffs were not entitled to an injunction even if the statute were unconstitutional, because plaintiffs had "a plain, adequate and complete remedy at law" in the state courts which had not been "exhausted." 244 F.Supp. at 851, 853.

Judge Mize found that it was "not necessary to pass on the constitutionality of this Act [section 2318.5], even though

---

1. Hereafter section 2318.5. The bracketed portions were added by amendment to the statute on July 9, 1964. Section 2318.5 (House Bill No. 546, as amended) reads as follows:

"1. It shall be unlawful for any person, singly or in concert with others, to engage in picketing or mass demonstrations in such a manner as to obstruct or [unreasonably] interfere with free ingress or egress to and from any public premises, State property, county or municipal courthouses, city halls, office buildings, jails, or other public buildings or property owned by the State of Mississippi, or any county or municipal government located therein, or with the transaction of public business or administration of justice

therein or thereon conducted or so as to obstruct or [unreasonably] interfere with free use of public streets, sidewalks, or other public ways adjacent or contiguous thereto.

"2. Any person guilty of violating this act shall be deemed guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than Five Hundred Dollars ($500.00), or imprisoned in jail not more than six (6) months, or both such fine and imprisonment.

"3. This act shall not be construed to affect any suit or prosecution now pending in any court.

"4. This act shall take effect and be in force from and after its passage."

there can be slight doubt as to its constitutionality" and, therefore, held that "it is the duty of the Federal Court to abstain and permit the plaintiffs to pursue their state remedies". 244 F. Supp. at 851, 855–856.

I dissented, stating (244 F.Supp. at 858): "In my opinion, the statute is so clearly unconstitutional that this case is hardly one 'required * * * to be heard and determined by a district court of three judges,'" and concluded that "the statute under attack is clearly unconstitutional, and the plaintiffs are just as clearly entitled to have its enforcement enjoined." 244 F.Supp. at 858.

On appeal the Supreme Court vacated the judgment and remanded the case to the district court, setting two tasks: First, whether under the federal anti-injunction statute an injunction against presently pending criminal cases is barred in this case. Second, whether under the criteria of Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), an injunction should issue against present, as well as future, enforcement of the statute. Justices Black, Harlan, White and Stewart dissented. Cameron v. Johnson, decided June 7, 1965, 381 U.S. 741, 85 S.Ct. 1751, 14 L.Ed.2d 715.

Subsequent to the district court's opinion, all of the state prosecutions involved in this case were removed under 28 U.S.C.A. § 1443 to the federal courts. Following the opinion of the Supreme Court in City of Greenwood v. Peacock, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966), these cases were remanded to state courts. Hartfield et al. v. State of Mississippi, 363 F.2d 869 (5 Cir. 1966). Judge Mize having died, Circuit Judge Coleman was designated as the third member of the three-judge panel. A full evidentiary hearing was held and the case is now ripe for determination.

## I.

The threshold question is whether the federal anti-injunction statute, 28 U.S. C.A. § 2283 (1965 ed.),[2] bars the granting of injunctive relief in a suit brought under the civil rights statute, 42 U.S.C.A. § 1983 (1964 ed.).[3] Section 2283 reads as follows:

"A court of the United States may not grant an injunction to stay proceedings in a State court *except as expressly authorized by Act of Congress,* or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." (Emphasis added.)

The plaintiffs contend that § 2283 does not proscribe an injunction in the present case, because such relief is "expressly authorized by" § 1983. Section 1983 reads as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, *suit in equity, or other proper proceeding for redress.*" (Emphasis added.)

Since § 1983 authorizes a "suit in equity," the argument is that it also authorizes injunctive relief. The authorities on this problem are in conflict. I would hold that under the circumstances of this case, if the allegations are proved, § 1983 is an express exception to § 2283.

In Cooper v. Hutchinson, 184 F.2d 119 (3 Cir. 1950), the Third Circuit held that § 1983 constituted an express authorization for the granting of an injunction against state court proceedings within the meaning of § 2283.[4] Unfortunately, the Third Circuit merely stated its conclusion without illuminating its rationale.

2. Hereafter § 2283.

3. Hereafter § 1983.

4. Followed in Tribune Review Publishing Co. v. Thomas, 153 F.Supp. 486 (W.D. Pa.1957).

In Smith v. Village of Lansing, 241 F.2d 856 (7 Cir. 1957),[5] and Goss v. State of Illinois, 312 F.2d 257 (7 Cir. 1963), the Seventh Circuit, without considering *Cooper*, held that section 1983 was not an express exception to section 2283. Neither of these expressions by the Seventh Circuit took time to exhaustively examine the problem or propound a carefully considered rationale.[6] The Sixth Circuit, also without considering *Cooper* or explaining its reasoning, reached a result consistent with the Seventh Circuit.[7] Sexton v. Barry, 233 F.2d 220 (6 Cir. 1956).

The circuit court first to consider this question at length was the Fourth Circuit, sitting en banc, Baines v. City of Danville, 337 F.2d 579 (4 Cir. 1964). In determining that section 1983 was not an express exception to section 2283, the Fourth Circuit reasoned that if section 1983 was read as an express exception to section 2283 there would be little room left in which section 2283 might have an effective field of operation. The Fourth Circuit explained its holding as follows (337 F.2d 579 at 589):

"Creation of a general equity jurisdiction is in no sense antipathetic to statutory or judicially recognized limitations upon its exercise. Effective removal of a cause of action from a state court to a federal court is incompatible with further proceedings in the state court, but there is no incompatibility between a generally created equity jurisdiction and particularized limitations which restrict a chancellor's power or define the limits of his discretion.

"The anti-injunction statute can have effective application only with respect to those matters over which the district courts have a general equity jurisdiction. If there is no jurisdiction to grant an injunction of any kind, there is no room for the operation of a narrow statutory prohibition of injunctions having a specified effect. If every grant of general equity jurisdiction created an exception to the anti-injunction statute, the statute would be meaningless."

In Dilworth v. Riner, 343 F.2d 226 (5 Cir. 1965), Judge Bell speaking for the Fifth Circuit recognized the cogency of the *Baines* rationale as a general proposition. *Dilworth* held that section 203(a)–(c) of the 1964 Civil Rights Act, 42 U.S.C.A. § 2000a–3(a), was an express exception to section 2283. Section 203 specifically grants the power to issue "a permanent or temporary injunction, restraining order or other order," where certain rights have been invaded. This specific grant is in stark contrast to the broad general subject matter encompassed in section 1983.

However, to be an express exception a statute need not be as clear a grant as section 203 of the 1964 Civil Rights Act, nor need a statute even mention the term injunction. Porter v. Dicken, 328 U.S. 252, 66 S.Ct. 1094, 90 L.Ed. 1203 (1946); Amalgamated Clothing Workers of America v. Richmond Bros. Co., 348 U.S. 511, 75 S.Ct. 452, 99 L.Ed. 600 (1955); Dil-

5. Followed in Progress Dev. Corp. v. Mitchell, 182 F.Supp. 681 (N.D.Ill.1960). See also Island Steamship Lines, Inc. v. Glennon, 178 F.Supp. 292 (D.Mass.1959).

6. Judge Mize in Chaffee v. Johnson, 229 F.Supp. 445 (S.D.Miss.1964) adopted the position of the Seventh Circuit. In affirming Judge Mize's disposition of the litigation on its facts, the Fifth Circuit declined to meet the issue raised by section 1983. Chaffee v. Johnson, 352 F.2d 514 (5 Cir. 1965) (per curiam).

7. In Moss v. Hornig, 314 F.2d 89 (2 Cir. 1963), the Second Circuit had before it the issue of whether section 1983 authorized the enjoining of State court criminal proceedings. Judge Lumbard, speaking for the Court, held that it did. That case involved the question of whether Connecticut's alleged selective enforcement of its Sunday closing laws violated the State defendant's equal protection of the laws. After considering the doctrine of comity, the Second Circuit affirmed the trial court's conclusion that the State defendant failed to submit adequate proof to warrant an injunction. Oddly, section 2283 was never considered or mentioned.

worth v. Riner, 343 F.2d 226 (5 Cir. 1965) (dictum); Beal v. Waltz, 309 F.2d 721 (5 Cir. 1962). See also Toucey v. New York Life Insurance Co., 314 U.S. 118, 62 S.Ct. 139, 86 L.Ed. 100 (1941); Jacksonville Blow Pipe Co. v. Reconstruction Finance Corp., 244 F.2d 394 (5 Cir. 1957); T. Smith & Son, Inc. v. Williams, 275 F.2d 397 (5 Cir. 1960); Brown v. Wright, 137 F.2d 484 (4 Cir. 1943). The principles rationally extrapolated from the cases creating express exceptions to the prohibition of section 2283 derive content from the concrete situations which gave rise to them. Where a specific, limited and clearly delineated substantive right has been conferred by Congress the courts have found an express exception to section 2283. The express exception is the necessary concomitant of the need to vindicate federally-created rights and is entirely consistent with the history of section 2283.

Section 2283 and its predecessors date back to 1793 when Congress enacted an unqualified prohibition on injunctions: "* * * nor shall a writ of injunction be granted [by any federal court] to stay proceedings in any court of a state * * *." [8] Section 5 of the Act of March 2, 1793, 1 Stat. 335. The scope of this original statute and its successors has been restricted by judicial construction; interestingly, whenever Congress has acted it has always acted to further restrict the scope of the anti-injunction

statute. As the Third Circuit said in In re Standard Gas & Electric Co., 139 F.2d 149 (3 Cir. 1943) at 152, "[T]he purpose of its [2283's] prohibition was to prevent federal courts, when exercising jurisdiction coordinate with state courts, from drawing to themselves the right to determine adverse claims."

Section 2283 is aimed primarily at allowing state courts to proceed to the determination of issues involving state law which might be drawn to the federal courts. The allegations in the instant case show that this Court is asked to vindicate primarily federal rights protected by a specific federal statute. The charge is that section 2318.5 as applied here is a subterfuge for denying plaintiffs their federally protected rights as they relate to voting.

The activity engaged in by plaintiffs today has specific federal protection. 42 U.S.C.A. § 1973i(b) states: [9]

"(b) No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under sections 1973a

8. The history of section 2283 is discussed at length by the Supreme Court in Toucey v. New York Life Insurance Co., 314 U.S. 118, 62 S.Ct. 139, 86 L.Ed. 100 (1941). See also Amalgamated Clothing Workers of America v. Richmond Brothers Co., 348 U.S. 511, 75 S.Ct. 452, 99 L.Ed. 600 (1955); Jacksonville Blow Pipe Co. v. Reconstruction Finance Corp., 244 F.2d 394 (5 Cir. 1957); T. Smith & Son, Inc. v. Williams, 275 F.2d 397 (5 Cir. 1960).

9. A similar prohibition is found in 42 U.S. C.A. § 1971(b). United States v. Bruce, 353 F.2d 474 (5 Cir. 1965). Unlike 42 U.S.C.A. § 1971(b), section 1973i(b) does not require that the prohibited acts be racially motivated; nor does section

1973i(b) require proof of a "purpose" to interfere as does section 1971(b). "[N]o subjective purpose or intent need be shown." House Rep.No.439 to accompany H.R. 6400, June 1, 1965. 2 U.S.Code Cong. & Adm.News p. 2532. While section 1973i(b) had not been enacted when this suit was first instituted, this is an equity suit and the law must be applied as it now stands. If further prosecution under section 2318.5 would be inconsistent with section 1973i(b), it must be abated. Section 1971(b) which prohibits the same behavior was enacted before section 2318.5. If the allegations alleged here are true, further prosecution under section 2318.5 would be inconsistent with section 1971(b). United States v. Bruce, supra.

(a), 1973d, 1973f, 1973g, 1973h, or 1973j(e) of this title."

The allegation is that the purpose of section 2318.5 and these arrests and prosecutions under that section is to harass and punish the plaintiffs for their participation in the civil rights movement and to deter them, and others similarly situated, from exercising rights of free speech and assembly guaranteed by the Federal Constitution and the right to urge or aid others to attempt to register and vote guaranteed by federal statute. If this allegation is true, plaintiffs are not asking the federal courts to enjoin the proper application of state law in state courts, but are merely asking that federal rights be vindicated in federal courts which are primarily responsible for protecting those rights.[10] Under these circumstances, section 1983 is and should be an express exception to section 2283. Cox v. State of Louisiana (II), 348 F.2d 750 (5 Cir. 1965).[11]

In the second Cox case, the question was whether, under conditions parallel to those alleged here, the litigation could be removed from a state to a federal court. Judge Wisdom, speaking for the Court, addressed himself to the question of whether an injunction against the prosecution could issue. He stated (348 F.2d 750 at 752):

"A civil complaint asserting such an abuse of the prosecutorial function would state a claim under the Civil Rights Act, 42 U.S.C. § 1983 and justify injunctive relief. Dombrowski v. Pfister, 1965, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22. This is not a Douglas v. City of Jeannette [319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324], Stefanelli [Stefanelli v. Minard, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138], or Cleary v. Bolger [371 U.S. 392, 83

S.Ct. 385, 9 L.Ed.2d 390] situation. Here the State, through the parish district attorney, under the guise of protecting the administration of justice, is challenging the Nation on a national policy expressed in the Constitution, carried out by Congress, and validated by the Supreme Court.

"The general principle, basic to American Federalism, that United States courts usually should refrain from interfering with state courts' enforcing local laws is unassailable. But the sharp edge of the Supremacy Clause cuts across all such generalizations. When a State, under the pretext of preserving law and order uses local laws, valid on their face to harass and punish citizens for the exercise of their constitutional rights or federally protected statutory rights, the general principle must yield to the exception: the federal system is imperiled."

Accord, Hillegas v. Sams, 349 F.2d 859 (5 Cir. 1965) (separate opinion of Judge Brown). In McNeese v. Board of Education, 373 U.S. 668 at 671, 672, 83 S.Ct. 1433 at 1435, 10 L.Ed.2d 622 (1963), the Supreme Court said:

"That is the statute [1983] that was involved in Monroe v. Pape, 7 Cir., supra [365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492]; and we reviewed its history at length in that case. 365 U.S. at 171, et seq., [81 S.Ct., at 475, et seq.] The purposes were severalfold— to override certain kinds of state laws, to provide a remedy where state law was inadequate, 'to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice' (id., 174, 81 S.Ct. 477), and to provide a remedy in the federal courts supplementary to any remedy

10. McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963) at 671.

11. To avoid confusion, the first case, Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), in which the Supreme Court reversed a con-

viction litigated through the State courts, will be referred to as Cox (I). The second case, Cox v. Louisiana, 348 F.2d 750 (5 Cir. 1965), in which the Fifth Circuit held that attempts to prosecute Reverend Cox subsequent to Cox (I) could be removed to federal court, will be referred to as Cox (II).

any State might have. Id., 180–183, 81 S.Ct. 480–482.

"We would defeat those purposes if we held that assertion of a federal claim in a federal court must await an attempt to vindicate the same claim in a state court. The First Congress created federal courts as the chief—though not always the exclusive—tribunals for enforcement of federal rights. * * * "

The great danger in federal intervention in state criminal litigation is that it will cause that litigation to be conducted piecemeal. Thus, federal courts have declined to intervene to suppress alleged illegally seized evidence. The defendant must await federal review through certiorari or by habeas corpus. In the instant case, if the plaintiffs succeed, then the litigation, present and future, will be brought to an end. As Judge Wisdom said in the Cox (II) case, 348 F.2d 750–755: "[T]here is no federal invasion of states' rights. Instead, there is rightful federal interposition under the Supremacy Clause of the Constitution to protect the individual citizen against state invasion of federal rights." [12] In City of Greenwood v. Peacock, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966), the Supreme Court held that prosecutions such as those here involved are not removable under 28 U.S.C.A. § 1443. In so holding, the Supreme Court recognized that under "extraordinary circumstances," where the state prosecutions are themselves used to intimidate persons in the exercise of their constitutional and federal statutory rights, federal injunctions are available to protect these precious rights. City of Greenwood v. Peacock, 384 U.S. 808, at 829, 86 S.Ct. 1800 (1966).

While the Baines case may be correct as a general principle, its reasoning cannot be logically applied to cases involving specific rights clearly and specifically protected under a federal statute. If the allegations made here are true, the officials of the State of Mississippi by bringing or further continuing the prosecutions here involved have committed a federal crime. Would it not be absurd to say that the public officials here involved may be fined $5,000 and imprisoned for 5 years by a federal court,[13] yet that same federal court may not enjoin their commission of that crime and thus prevent their effecting the very injury the statute is designed to prevent?

Moreover, section 2283 is not a jurisdictional statute, and in spite of its absolute language does not prevent a federal court from issuing an injunction against a state court proceeding where conditions warrant such relief. Section 2283 is a statutory adoption of the doctrine of comity. Judge Wisdom, writing for the Fifth Circuit in Southern California Petroleum Corp. v. Harper, 273 F.2d 715 (5 Cir. 1960) at 718–719, said:

"Section 2283 is essentially a rule of comity, and the demand here that a federal court interfere with state court

---

12. In McNeese v. Board of Education, 373 U.S. 668 at 674, n. 6, 83 S.Ct. 1433 at 1437, 10 L.Ed.2d 622 (1963), the Supreme Court said:

"As well stated by Judge Murrah in Stapleton v. Mitchell, [D.C.,] 60 F.Supp. 51, 55, appeal dismissed pursuant to stipulation, 326 U.S. 690 [66 S.Ct. 172, 90 L.Ed. 406]: 'We yet like to believe that wherever the Federal courts sit, human rights under the Federal Constitution are always a proper subject for adjudication, and that we have not the right to decline the exercise of that jurisdiction simply because the rights asserted may be adjudicated in some other forum.' "

13. 42 U.S.C.A. § 1973j(a) and (c); cf. United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). (The provisions of 18 U.S.C.A. § 241 impose punishments of up to 10 years in prison for those who conspire to deprive any citizen of the "free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States" by "causing the arrest of Negroes by means of false reports that such Negroes had committed criminal acts."

proceedings is directed to the discretion of the federal court. This discretion should be exercised in the light of the historical reluctance of federal courts to interfere with state judicial proceedings" [14]

The Fourth Circuit in Baines v. City of Danville, supra, 337 F.2d at 593, clearly recognized this distinction when it said:

"Since the statute was fathered by the principles of comity, it has been held that the statute should be read in the light of those principles and, though absolute in its terms, is inapplicable in extraordinary cases in which an injunction against state court proceedings is the only means of avoiding grave and irreparable injury. In our view, the congressional command ought to be ignored only in the face of the most compelling reasons, but we have certainly been told by the Supreme Court that in those circumstances it may be disregarded, for its parentage discloses that it was not intended to be as absolute as it sounds."

Accord: Hulett v. Julian, 250 F.Supp. 208 (M.D.Ala.1966) (three-judge district court); Zellner v. Lingo, 218 F.Supp. 513 (M.D.Ala.1963), aff'd, 334 F.2d 620 (5 Cir. 1964); Feldman v. Pennroad Corp., 60 F.Supp. 716 (D.Del.1945), aff'd, 155 F.2d 733 (3 Cir. 1946), cert. den., 329 U.S. 808, 67 C.Ct. 621, 91 L.Ed. 690 (1947). See also cases collected Baines v. City of Danville, 337 F.2d 579 at 591, n. 10 (4 Cir. 1964).

The fact that section 2283 is only a comity statute and does not prevent the issuance of an injunction was recognized by Judge Mize in this case. Cameron v. Johnson, 244 F.Supp. 846 at 851 (S.D. Miss.1964). Therefore, we turn to the only real issue in this case, do the facts as proved require the granting of the relief requested?

## II.

The demonstrations which resulted in the arrest under section 2318.5 had their origin during January of 1964. For several days prior to January 22 the Council of Federated Organizations [15] and others [16] distributed leaflets. These leaflets declared that January 22 would be "freedom day." A rally was to be held which included picketing the Forrest County Court House [17] in a protest against discrimination in voter registration.[18]

On January 22 several hundred persons, Negroes and whites, appeared at the Court House, as did reporters from the local and national press. The County Sheriff designated a "march route" which the demonstrators followed in picketing the Court House.[19]

Subsequent to January 22 the picketing of the Court House continued. The area designated by the Sheriff "consisted of three sides, the east, north and west side of the court house." The demonstrators during this early period sang, chanted, prayed and preached.[20]

To facilitate access to the Court House, the Sheriff blocked off a small area to the right of the main entrance to the Court House where the picketers were allowed to continue their activities. The axis of this area of march was an irregu-

14. Section 2283 is sometimes referred to as denying "jurisdiction to a federal court to enjoin proceedings in a State court except in unusual circumstances". Williamson v. Puerifoy, 316 F.2d 774 (5 Cir. 1963) (per curiam) at 775. The doctrine is clearly one of comity and the principles of comity determine when "unusual circumstances" exist.

15. Hereafter COFO.

16. Reverend Cameron was director of the Hattiesburg Ministers' Project for the National Council of Churches of Christ.

17. Hereafter Court House.

18. Trial record (hereafter Tr.) 271, 220, 230.

19. Tr. 220–21, 230, 271.

20. Tr. 221, 230–31, 271–72.

larly shaped grassy plot with a flag pole on it.[21] It is difficult to verbalize the scene, so a scale drawing is reproduced here for convenience:

21. Tr. 77, 178, 222, 231, 272.

Picketing continued into April of 1964. All agree that from April 1 until April 11 pickets were present every day except Sundays. From April 1 until April 9 the number varied from 7 to 20.[22]

Unlike the earlier mass picketing where hundreds were present, the picketing in April was entirely orderly and quiet. The pickets did not sing, chant, pray or preach. "The only noise" they "made was an occasional comment to one another in normal conversation." They in no way made any noise that would disturb the transaction of business within the Court House.[23]

The pickets marched steadily but slowly. They made it a point to be courteous to persons desiring to pass them and never blocked anyone from passing them.[24] This was the situation that persisted until April 9.

On April 9 a small group was picketing the Court House. As was their usual practice, they started "to disband the picket" line around four o'clock. Several police officers arrived and "began to break down the wooden barriers" which had previously delineated their line of march. Sheriff Gray accompanied by Mr. Dukes, the County Prosecuting Attorney, and Deputy Morgan approached the group asking for their attention. A copy of section 2318.5, which had just been passed by the Mississippi legislature and had just been received in Hattiesburg, was read to them. The Sheriff then gave them five minutes in which to disperse, which they did.[25]

On the morning of April 10, they assembled shortly after 9 A.M. at the COFO headquarters. They lined up approximately 10 feet apart and walked to the Court House.[26]

The pickets arrived at the corner across from the Court House at about 10 A.M. where they found a normal flow of traffic. They "waited to cross the street until the policeman had halted traffic as he did for all pedestrians." They "crossed with other pedestrians and then began to march in the area previously designated for picketing in a very orderly fashion." Because of the previous warning they were "more frightened" than before and "for that reason" they "were more orderly and quiet" than previously.[27]

This was the largest number of pickets that had participated in the marching that week. They numbered about 40.[28] After a short time, Sheriff Gray stopped the pickets. The testimony here is in dispute. The defendants' witnesses testified that Sheriff Gray warned the pickets that they were violating section 2318.-5, and when they failed to disperse he placed them under arrest.[29] Plaintiffs' witnesses testified that they were placed under arrest without warning or that, in any event, if there was a warning they did not hear it.[30]

This large group was then placed in jail for obstructing free ingress to or egress from the Court House.[31] At the time of the arrest the area immediately adjacent to the picketing area was congested with spectators. There were 20 or 25 people standing on the main steps of the Court House and a "tight knot of people" were "blocking the sidewalk." None of these persons were arrested or

22. Tr. 85, 72, 122, 224, 235, 273. Connor testified that at times it reached as many as 38 or 39. Tr. 232.

23. Tr. 39–40, 107.

24. Tr. 126.

25. Tr. 34, 77, 109–110, 273–77.

26. Tr. 83–84.

27. Tr. 37, 111–12, 147, 171, 279.

28. Estimates of how many picketers participated in the April 10 morning demonstration ranged from 28 to 43. Tr. 36, 51, 90, 182, 201, 279, 320, 334. At no time were they warned that a large group could not picket the Court House. Tr. 50.

29. Tr. 276–77, 282, 335. Reverend Brown also thought that Sheriff Gray might have given them one minute to disperse before arresting them. Tr. 56.

30. Tr. 39, 113–14, 143–45, 172, 226.

31. No one made any attempt to lie down or resist arrest. Tr. 39.

asked to move on. Since they were neither "picketing" nor engaging in "mass demonstrations," they were not subject to section 2318.5.[32]

On the afternoon of April 10, Mary Williams and nine other persons were arrested for violating section 2318.5 by peacefully and quietly picketing the area around the flag pole. On April 11 nine more pickets were arrested. Between April 11 and May 18 spasmodic picketing continued without incident. On May 18 a group of nine demonstrators began picketing in the area around the flag pole. They were ordered to cease obstructing ingress to and egress from the Court House. Two of the pickets then left and the other seven were arrested.[33] After May 18 picketing was not resumed.[34]

The defendants contend that section 2318.5 is constitutional on its face and that it was properly applied so as to protect the normal transaction of business in the Court House. The plaintiffs contend that section 2318.5 is unconstitutional on its face and was clearly unconstitutionally applied.

I would conclude that an inspection of the record in this case clearly shows that section 2318.5 was unconstitutionally applied. Moreover, the application of the statute in this case illustrates how vague the statute really is and compels the conclusion that it is unconstitutional on its face.

The main thrust of the defendants' argument is that the pickets obstructed the entrance to the County Court Room, designated as "B" on the drawing, and the entrance to the Home Demonstration Office, designated as "A" on the drawing. I will treat the Home Demonstration Office first.

The Home Demonstration Office is a small office with only one entrance. It has no inside entrance to the interior of the Court House. Mrs. Pearl Burkett is the Home Demonstration Agent. She leaves her office and goes to the County Agent's office about four or five times each day.[35] To get there, she leaves her office and proceeds along the walk to the main steps of the Court House and proceeds up those steps to the second floor. The sidewalk at one point narrows to as little as 3.8 feet.

On the morning of April 10 during the picketing, Mrs. Burkett found it necessary to go to the County Agent's Office. She testified (Tr. 317): "I started the regular route and they were so close together that I had to wait for just a moment to get in line and I fell in line with them and started weaving back and forth until I reached the front steps and then dropped out of the line." Her testimony is, of course, the only real testimony of obstruction contained anywhere in the record.[36] While the walkway is wide enough at most points for her to walk past the pickets, for about six feet it is only 3.8 feet wide. To be comfortable one would most likely have to walk single file in line, one person behind another, at that point. Thus, she had to weave back and forth by falling "in line with them" for a few steps. They were not discourteous; she was not bumped or molested; they were peaceful and orderly.[37] Whatever "obstruct" may mean, here, clearly Mrs. Burkett was not block-

---

32. Tr. 37–38, 78–80, 83, 111, 129, 130–31, 136.

33. Tr. 153, 154–55, 158–59, 199, 227, 301, 305. See affidavit of Sheriff Gray, p. 1. There appears to be some confusion between the arrests made on May 18 and those made on April 11. Sheriff Gray's affidavit shows 7 persons were arrested on May 18 after 2 persons left rather than be arrested. Mr. Wells indicated that similar events transpired on April 11 leading to the arrest of 7 persons. Tr. 199.

34. Tr. 204–05, 211. See also Tr. 192.

35. Tr. 315.

36. At the time of the arrests no one in the vicinity sought to enter the Court House and no one was actually obstructed from entering it on business. Tr. 39. See also Tr. 107.

37. Exactly how far apart the pickets were is not clear. One witness thought it was 3 to 4 feet. Tr. 125. Another testified it was 6 to 10 feet. Tr. 84, 91.

ed or prevented from making her sojourn to the County Agent's Office. Nor is there a single shred of evidence that the pickets were unwilling to let persons pass at anytime before or during the demonstration.

In the past the pickets had seen persons come out of the main steps to the Court House and pass them and the Home Demonstration Office on their way to the parking area behind the Court House.[38] The pickets were never told that they blocked the Home Demonstration Office door. One witness recalled Mrs. Burkett passing them on the way into her office on several mornings. She would greet them "cordially." [39] Another picket recalled at least three persons "who had easy access to that door ["A"] who walked by me on the way to business in that particular office." [40] These earlier instances are of continuing importance since Mr. Dukes testified that had the law been in effect, the earlier picketing would have violated it.[41]

The problem of blocking the entrance to the County Court Room is even clearer. Reverend Brown, like the other witnesses for the plaintiffs, testified that the entrance to the County Court Room was never blocked.[42] The defense presents an appealing picture as to the blocking of entrance "B". Mr. Selby Bowling, President of the Forrest County Board of Supervisors, was attracted by "curiosity as much as anything else" to the steps of the Court House on the morning of April 10th, where he watched the arrest of the demonstrators who he described as a "nuisance." [43] The reason entrance "B" must be kept open is, according to Mr. Bowling, that "there are a lot of elderly people who use that and

catch the elevator to go to the second floor." This use of the ground floor elevator, in his "opinion," was prevented by the pickets.[44] Of course, the Court House is symmetrical and there is an entrance to the County Court Room, identical to the one marked "B", on the opposite side of the Court House steps, which entrance is marked "R" in the drawing, p. 888, supra. This entrance was in no way affected by the picketing. Surely we cannot silence a peaceful group in the orderly exercise of their freedom of speech just because they pass in front of one of several entrances to a court house.[45] Here, entrance "R" was available, or the main entrance, or even the back entrance from the parking lot.

The only evidence in this record of this blockage of entrance is the testimony of Mr. Dukes, who testified that, prior to the arrests on the morning of April 10, he tested the obstruction by attempting to walk against the current of the line of pickets. He said he could not.[46] I do not find this testimony sufficient to overcome the weight of all the other testimony contained in this record.

The danger occasioned by section 2318.-5 is made even more evident when we examine the further arrests made on the afternoon of April 10, on April 11, and on May 18, not one of which groups exceeded 10 persons.[47] These pickets were arrested because they walked so closely together that no one could pass between them, thus they obstructed ingress to and egress from the Court House.[48]

Picture 10 persons walking very closely together, which would occupy a space of about 16 to 20 feet. Now picture this group at the point where I have marked "T" on the drawing, just above and to the

38. Tr. 32–33; 74.

39. Tr. 74.

40. Tr. 108, 123.

41. Tr. 292–93.

42. Tr. 19–20, 30, 32, 126–127; see in addition, Tr. 74, 107–08, 123.

43. Tr. 327.

44. Tr. 330, 331.

45. As Reverend Brown put it, "we couldn't possibly be blocking because of all the entrances to this building." Tr. 43.

46. Tr. 281.

47. See n. 34, supra, and accompanying text.

48. Tr. 284–85; see affidavit of Sheriff Gray.

left of the flag pole. If they were there, the entire remainder of their route would be left open both in front and in back. Can these people logically be arrested for obstructing points "B" and "A" when the majority of their time in walking about the flag pole will leave the walkways totally unobstructed? I think not.[49]

To illustrate, take the group arrested on the afternoon of April 10. Mrs. Mary Williams went to the Court House with a group of nine other persons, ranging in age up to 18 or 21. The 10 of them then proceeded to picket around the flag pole. Mrs. Williams testified (Tr. 157):

"Q. Did anybody try to go in or out of the court house while you all were there?

"A. No, they didn't, was'nt no one there to enter the court house, we were just on the line picketing." [50]

They were arrested for obstructing ingress to and egress from the Court House under section 2318.5.

With these facts in mind, I think the law on this subject clearly compels the conclusion that section 2318.5 and its application in this case are unconstitutional. This case is strikingly similar to Cox v. State of Louisiana (I), 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), where the Supreme Court was called upon to consider the constitutionality of a statute forbidding the obstructing of public passages.[51] There was no doubt in *Cox (I)* that the sidewalk across from the Court House "was obstructed, and thus, as so construed, appellant violated the statute." 379 U.S. at 553, 85 S.Ct. at 464. The Court rejected the idea "that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech." 379 U.S. at 555, 85 S.Ct. at 465. Nonetheless, the statute in question was held invalid.

The operative fact that made the statute unconstitutional was the overly-broad reach that allowed city officials to choose which demonstrations would be permitted. 379 U.S. at 557, 85 S.Ct. 453. Cf. Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966), and cases there cited. In the instant case, the same condition prevails. A single picket could be viewed as obstructing ingress and egress because for an instant he blocked entrance "A" or "B" to the Court House. Such an application of section 2318.5 is no more unlikely than that 10 persons would be so charged when they could only block free and unfettered access to "A" or "B" for an instant and leave it unblocked for substantial periods.[52] These arrests were made at a time when not a single person desired access to entrances "A" or "B." What the Supreme Court said in *Cox (I)*, I

**49.** The distance from point "T" to the corner is well over 48 feet, and the distance from the corner to where the pickets would again enter the walkway is over 16 feet. The idea that while walking this 60 some odd feet these 10 pickets blocked entrances "A" and "B" is totally absurd.

**50.** See also Tr. 156.

**51.** *"Obstructing Public Passages*
    "No person shall wilfully obstruct the free, convenient and normal use of any public sidewalk, street, highway, bridge, alley, road, or other passageway, or the entrance, corridor or passage of any public building, structure, watercraft or ferry, by impeding, hindering, stifling, retarding or restraining traffic or passage thereon or therein.
    "Providing however nothing herein contained shall apply to a bona fide legitimate labor organization or to any of its legal activities such as picketing, lawful assembly or concerted activity in the interest of its members for the purpose of accomplishing or securing more favorable wage standards, hours of employment and working conditions." La.Rev.Stat. § 14:-100.1 (Cum.Supp.1962).

**52.** Note that section 2318.5 states: "It shall be unlawful for any person, *singly* or in concert with others * * *." (Emphasis added.)

think, is equally applicable here (379 U.S. at 557–558, 85 S.Ct. at 466):

"It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups either by use of a statute providing a system of broad discretionary licensing power or, as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute."[53]

This situation must be distinguished from the precisely drawn, narrow statutes that have been consistently and carefully applied. About such statutes the Supreme Court in *Cox (I)* said:

"It is, of course, undisputed that appropriate, limited discretion, under properly drawn statutes or ordinances, concerning the time, place, duration, or manner of use of the streets for public assemblies may be vested in administrative officials, provided that such limited discretion is 'exercised with "uniformity of method of treatment upon the facts of each application, free from improper or inappropriate considerations and from unfair discrimination" * * * [*and with*] a "*systematic, consistent and just order of treatment, with reference to the convenience of public use of the highways* * * *."'' Cox v. State of New Hampshire, supra, [312 U.S. 569], at 576 [61 S.Ct. 762, at 766, 85 L.Ed. 1049]. See Poulos v. New Hampshire, supra [345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105]" (Emphasis added.) 379 U.S. at 558, 85 S.Ct. at 466.

Perhaps the Constitution allows broader power to be vested in public officials where they have showed themselves to be "consistent and just," with a "uniformity of method," "free from improper" "considerations" or "unfair discrimination," but the record in the present case clearly will not support such a grant. If we are not blinded by the one large group of pickets arrested, but take the entire record, we must see to what great abuse this broad grant of power is subject. This is a case of selective enforcement. While not all pickets were arrested on each occasion, the arrests were frequent enough to have the desired effect. By May 18 this "nuisance" was eliminated. If there is anything "consistent" or if any "uniformity" appears in this record, it is that section 2318.5 was consistently used to harass the civil rights' movement in Hattiesburg.

Contrary to Judge Coleman's opinion, I think that the Florida statute sustained in the five-to-four decision in Adderley et al. v. State of Florida, (1966) 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149, was not so vague as the statute here involved. That is so because here the statute requires no specific intent, while in *Adderley* the trespass must have been "with a malicious and mischievous intent." "Malicious" and "mischievous" were fully defined by the trial court, and Mr. Justice Black wrote for the majority that the use of those terms made the meaning of the statute "more understandable and clear":

"Petitioners seem to argue that the Florida trespass law is void for vagueness because it requires a trespass to be 'with a malicious and mischievous intent * * *.' But these words do not broaden the scope of trespass so as to make it cover a multitude of types of conduct as does the common-law breach-of-the-peace charge. On the contrary, these words narrow the

53. In the instant case, plaintiffs attempt to make an argument based on Hattiesburg's parade ordinance. That ordinance was not placed in evidence and we cannot therefore judge what that ordinance does or does not say. Unlike State statutes judicial notice cannot be taken of municipal ordinances. § 3374–77 (Miss. Code 1942). Bohannan v. City of Louisville, 164 Miss. 97, 144 So. 44 (1932).

See 5 Moore's Fed.Prac. ¶43.09, n. 13. There is a distinction between parades, such as home-coming celebration parades by colleges, and picketing and demonstrating. What is an appropriate regulation for picketing and demonstrations may not be an appropriate regulation for parades. See generally, Smith v. City of Montgomery, 251 F.Supp. 849 (M.D.Ala. 1966).

scope of the offense. The trial court charged the jury as to their meaning and petitioners have not argued that this definition, set out below,[2] is not a

"2. ' "Malicious" means wrongful, you remember back in the original charge, the state has to prove beyond a reasonable doubt there was a malicious and mischievous intent. The word "malicious" means that the wrongful act shall be done voluntarily, unlawfully, and without excuse of justification. The word "malicious" that is used in these affidavits does not necessarily allege nor require the State to prove that the defendant had actual malice in his mind at the time of the alleged trespass. Another way of stating the definition of "malicious" is by "malicious" is meant the act was done knowingly and willfully and without any legal justification.

' "Mischievous," which is also required, means that the alleged trespass shall be inclined to cause petty and trivial trouble, annoyance and vexation to others in order for you to find that the alleged trespass was committed with mischievous intent.' R. 74.

reasonable and clear definition of the terms. The use of these terms in the statute, instead of contributing to uncertainty and misunderstanding, actually makes its meaning more understandable and clear." 385 U.S. 42, 43 and n. 2.

*Adderley* is distinguishable also from the present case because in *Adderley* the demonstrators went to the jail, while in this case they went to the Court House. Indeed, I think that *Adderley* supports the view which I take, because it recognizes the validity of Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963), and Cox v. Louisiana, 379 U.S. 536, 559, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), and the facts of this case bring it within the rule announced in *Edwards* and followed in *Cox (I)*, rather than in the rule announced in *Adderley*.

This case is an even stronger case than *Cox (I)*. Here there was no danger of disorder. No one preached the value of law-breaking or sit-ins. What was continuously stressed was that the pickets be courteous and block no one, that they be quiet and not disturb the normal functioning of the County Court. The line must be drawn between those demonstrators who wrongly believe that social justice can be attained at the expense of other peoples' liberty,[54] and those who peacefully and politely, without injury to others, gather to picket on behalf of their cause. This record proves that this is not a borderline case, but falls well within the limits of peaceful picketing.[55]

Section 2318.5 should also be clearly distinguished from the federal statute relating to "picketing or parading" "in

54. See Forman v. City of Montgomery, 245 F.Supp. 17 (M.D.Ala.1965), aff'd, 355 F. 2d 930 (5 Cir. 1966), cert. den., 385 U.S. 893, 87 S.Ct. 28, 17 L.Ed.2d 127 (1966); Johnson v. City of Montgomery, 245 F. Supp. 25 (M.D.Ala.1965).

55. In *Cox (I)* the Court said (379 U.S. at 554–555, 85 S.Ct. at 464, 13 L.Ed.2d 471):

"From these decisions certain clear principles emerge. The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection. One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations."

or near" a federal Court House.[56] The federal statute, like that involved in Adderley v. State of Florida, supra, contains a subjective intent provision not found in the Mississippi law. Thus, under the federal provision, one must not only perform the physical act of picketing or parading, or using a sound-truck to create a disturbance, but, in addition, have the specific intent to interfere with "the administration of justice."

These demonstrators quietly parading outside the Forrest County Court House could not have violated a statute patterned on the federal statute since there was no intention "of interfering with, obstructing, or impeding the administration of justice."[57] And there is no evidence that they did interfere with such administration.

The federal Act applies to obstructing justice, not obstructing "free ingress or egress to and from any public premises." The use of a loud sound-truck across the street from a federal courthouse could violate the federal statute, but *that alone* could not violate the Mississippi statute. The statutes are aimed at two distinct types of behavior. Most important, the federal statute with its specific intent provision restricted to certain types of improper influence is far more narrow than section 2318.5. For these reasons, I do not believe that the defendants can sustain section 2318.5 by comparing it to the federal picketing statute.

In Shuttlesworth v. City of Birmingham, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965), the question of when an ordinance is overly broad was again before the Supreme Court. The Court there said (382 U.S. at 90–91, 86 S.Ct. at 213):

"On its face, the here relevant paragraph of § 1142 sets out two separate and disjunctive offenses. The paragraph makes it an offense to 'so stand, loiter or walk upon any street or sidewalk * * * as to obstruct free passage over, on or along said street or sidewalk.' The paragraph makes it *'also* * * * unlawful for any person to stand or loiter upon any street or sidewalk * * * after having been requested by any police officer to move on.' (Emphasis added.) The first count of the complaint in this case, tracking the ordinance, charged these two separate offenses in the alternative.

"Literally read, therefore, the second part of this ordinance says that a person can stand on a public sidewalk in Birmingham only at the whim of any police officer of that city. The constitutional vice of so broad a provision needs no demonstration. It 'does not provide for government by clearly defined laws, but rather for

---

**56.** The federal statute, 18 U.S.C.A. § 1507, reads as follows:

"§ 1507. *Picketing or parading*

"Whoever, with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer, in the discharge of his duty, pickets or parades in or near a building housing a court of the United States, or in or near a building or residence occupied or used by such judge, juror, witness, or court officer, or with such intent uses any sound-truck or similar device or resorts to any other demonstration in or near any such building or residence, shall be fined not more than $5,000 or imprisoned not more than one year, or both.

"Nothing in this section shall interfere with or prevent the exercise by any court of the United States or its power to punish for contempt."

**57.** When the picketers arrived at the Court House on the morning of April 10, they were "apprehensive" because of the "threatened" arrest the day before, but they "came with the feeling that they were not disobeying this law [section 2318.5]." Tr. 37. They knew if they "blocked" free ingress to the Court House they would violate section 2318.5, but they did not see how they could "possibly be blocking because of all the entrances to this building." Tr. 43, 46. Reverend Vaux when asked if he specifically intended to violate the law by returning to picket on April 10, after being advised of its content and after the clergy had discussed it among themselves, said: "I would want to say we did not discuss the validity of the law. We discussed our right, constitutional right, to picket." Tr. 89.

government by the moment-to-moment opinions of a policeman on his beat.' Cox v. Louisiana, 379 U.S. 536, 559, 579, 85 S.Ct. 453, 466, 469, 476, 13 L.Ed.2d 471, 487 (separate opinion of Mr. Justice Black). Instinct with its ever-present potential for arbitrarily suppressing First Amendment liberties, that kind of law bears the hallmark of a police state."

Cf. Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966). The same may be said of the statute here involved. As demonstrated by the arrests made by police officers between April 10 and May 18 "a person can * * * [picket the County Court House] only at the whim of any police officer of that city." It is no answer that the police discriminated against these pickets only occasionally, for the constitutional vice is that the law allows them to discriminate at all.

The situation here may also be compared to the recent Supreme Court opinion in Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966). In that case, five Negroes were arrested for sitting in a library reading room. In describing their conduct, the Supreme Court explained (383 U.S. at 139, 86 S.Ct. at 722):

"Petitioners' deportment while in the library was unexceptionable. They were neither loud, boisterous, obstreperous, indecorous nor impolite. There is no claim that, apart from the continuation—for ten or fifteen minutes—of their presence itself, their conduct provided a basis for the order to leave, or for a charge of breach of the peace."

Reversing the conviction for breach of the peace, the Court stated (383 U.S. at 141–143, 86 S.Ct. at 723):

"We are here dealing with an aspect of a basic constitutional right—the right under the First and Fourteenth Amendments guaranteeing freedom of speech and of assembly, and freedom to petition the Government for a redress of grievances. The Constitution of the State of Louisiana reiterates these guaranties. See Art. I, §§ 3, 5.

As this Court has repeatedly stated, these rights are not confined to verbal expression. They embrace appropriate types of action which certainly include the right in a peaceable and orderly manner to protest by silent and reproachful presence, in a place where the protestant has every right to be, the unconstitutional segregation of public facilities. Accordingly, even if the accused action were within the scope of the statutory instrument, we would be required to assess the constitutional impact of its application, and we would have to hold that the statute cannot constitutionally be applied to punish petitioners' actions in the circumstances of this case. See Edwards v. South Carolina, supra, 372 U.S. at 235, 83 S.Ct. at 683 [9 L.Ed.2d 697]. The statute was deliberately and purposefully applied solely to terminate the reasonable, orderly, and limited exercise of the right to protest the unconstitutional segregation of a public facility. Interference with this right, so exercised, by state action is intolerable under our Constitution. Wright v. State of Georgia, supra, 373 U.S. [284,] at 292, 83 S.Ct. [1240] at 1245 [10 L.Ed.2d 349].

* * * * * *

"A State or its instrumentality may, of course, regulate the use of its libraries or other public facilities. But it must do so in a reasonable and nondiscriminatory manner, equally applicable to all and administered with equality to all. It may not do so as to some and not as to all. It may not provide certain facilities for whites and others for Negroes. And it may not invoke regulations as to use—whether they are ad hoc or general—as a pretext for pursuing those engaged in lawful, constitutionally protected exercise of their fundamental rights. Cf. Wright v. State of Georgia, supra, 373 U.S. at 293, 83 S.Ct. at 1246."

I would, therefore, hold that section 2318.5, both on its face and as applied, is unconstitutional.

This section 2318.5 carries with it all of the latent dangers described in Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). Clearly, arrest and prosecution for the exercise of a federally protected act is punishment for asserting that right and constitutes the attempt to intimidate, threaten, or coerce which in this case is specifically proscribed by 42 U.S.C.A. § 1973i(b) and § 1971. The cost of proceeding court by court that those presently charged and those yet to be charged under section 2318.5 must bear until their federal rights are vindicated is great. Those already having been subject to arrest have had to post bonds and hire lawyers at considerable cost. Those already having been subject to arrest and those too timid to dare to assert their rights in the face of imminent arrest have been subjected to an illegal restraint on their liberty. The presence of an unresolved criminal charge may hang over the heads of these plaintiffs for years while they track their cases to the Supreme Court through the state courts, if we do not enjoin any further proceedings against them. In Dombrowski v. Pfister, 380 U.S. 479, at 486, 85 S.Ct. 1116, at 1120 (1965) the Supreme Court said:

"A criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms. [Citations omitted.] When the statutes also have an overbroad sweep, as is here alleged, the hazard of loss or substantial impairment of those precious rights may be critical. For in such cases, the statutes lend themselves too readily to denial of those rights. The assumption that defense of a criminal prosecution will generally assure ample vindication of constitu-

tional rights is unfounded in such cases."

The Court went on to recognize that the "chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." 380 U.S. at 487, 85 S.Ct. at 1121. In a case such as the instant case, the Supreme Court said (380 U.S. at 492, 494, 85 S.Ct. at 1125):

*"In such cases, abstention is at war with the purposes of the vagueness doctrine, which demands appropriate federal relief regardless of the prospects for expeditious determination of state criminal prosecutions.*

\* \* \* \* \* \*

"So long as the statute remains available to the State the threat of prosecutions of protected expression is a real and substantial one. Even the prospect of ultimate failure of such prosecutions by no means dispels their chilling effect on protected expression." (Emphasis added.)

See also NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

The danger to freedom of speech and assembly of such a broad and vague delegation of power as here involved is too great to expose it to the long road of case-by-case litigation in the hope that some day the statute's reach will be narrowed to constitutionally permissible limits. The court's injunction may always be narrowed if and when the appropriate appellate courts of Mississippi construe the statute in all its vague peripheries. The real answer is that if the legislature desires to legitimately protect access to its public buildings, it must do so by a statute appropriately drawn.[58] Therefore, the injunction should issue as prayed.[59] I respectfully dissent.

---

58. There is no contention here that adding "unreasonably" to the statute has altered its scope. On the contrary, the defendants argue that the statute should always have been interpreted as if this word were present and that the persons arrested did unreasonably block the Court House. This record illustrates that this word cannot save the statute.

59. See NAACP v. Thompson, 357 F.2d 831 (5 Cir. 1966).

## SUPPLEMENTAL FINDINGS AND CONCLUSIONS

### PER CURIAM.

Be it remembered, that pursuant to an opinion and consequent order from the Supreme Court of the United States in this case *vacating* the original judgment of this Court, that this Court duly reconvened and heard and considered testimony and evidence, pro and con, in this case and after receiving briefs of the parties in support of their contentions, the Court now makes its further findings and conclusions by way of supplement to the findings and conclusions herein dated July 10, 1964.

### FINDING OF FACTS

The Court renews its former finding of facts, except as herein modified and amended, after hearing oral testimony and receiving other and further evidence in this case.

House Bill 546 now appears as Chapter 343, Mississippi Laws 1964, effective April 8, 1964. This enactment simply proscribed picketing or mass demonstrations which obstructed or interfered with free ingress and egress to and from county courthouses, or so as to obstruct or interfere with free use of public streets, sidewalks, or other public ways adjacent or contiguous thereto.

■ This Court finds the language of this statute to be so clear and so unambiguous as to constitute sufficient notice to all persons of that action and conduct which is proscribed and made illegal by this act. It complies with every constitutional requirement of the vagueness doctrine set forth in the opinions in this case. All of these plaintiffs had notice and actual knowledge of the fact that this law forbade them to march together in such large numbers and so close together as to make it impossible for business visitors desiring to enter the county courthouse to do so. The plaintiffs deliberately and defiantly and intentionally violated this law on the occasions in suit with the view and for the purpose of testing its constitutional validity under the circumstances.

This picketing actually commenced on January 22, 1964, when some two hundred pickets circled the courthouse and continued to do so from Monday through Saturday every week. It was taxpaying time when all taxpayers had to go to the courthouse and pay their license taxes and ad valorem taxes and other important seasonal business which had to be done at the courthouse. The sheriff, as custodian of the courthouse, had worked with the city police in Hattiesburg to contain the pickets and prevent an incident. The courthouse fronted northerly on Main Street in Hattiesburg. The sheriff told the plaintiffs that they could picket as much or as long as they pleased at the northeast corner of the courthouse fronting on North Main and Eaton Street, in the area shown in red on the plat in evidence. But they were requested not to walk in such numbers or so close together as to block entrances to the ground floor of the building. The blue area on the plat is immediately in front of the main steps to the main floor of the building. This plan afforded the plaintiffs a strip of city sidewalk on North Main Street and a strip of sidewalk on Eaton Street for demonstration purposes in the most conspicuous area of the premises. Prior to April 10, 1964, the plaintiffs cooperated with the authorities and did not block any entrances and were not arrested. But on April 10 and again on April 11, 1964 and finally on May 18, 1964, the plaintiffs in a group of thirty-five or forty people appeared in this area and walked around this space forming an almost complete circle in such a manner as to block the entrance to the Forrest County Cooperative Extension Service on the ground floor and the entrance to the county court section of the building, all as shown in yellow on the plat in evidence. An employee, trying to make her way from the County Cooperative Extension Service to the County Agent's office on the main floor of the building by way of the front main steps, had to get in this line as it passed and march with them until they arrived at a point opposite the front steps where she left them. The walks on the inner area were

approximately three feet wide as shown on the drawing. The sheriff and county attorney were unable to negotiate passage in the opposite direction along these walks by this circle of humanity without having to step off the walk on to the grass. This is positively not a case where we have as few as ten pickets marching in this area as suggested in the dissent. That sort of condition may have existed at some time prior to the arrest, when the testimony shows that they sometimes had as few as "three, eight, nine or ten pickets," but the incident in suit was provoked by thirty-five to forty people walking as close together as they could on these narrow walks on the courthouse lawn immediately in front of these important entrances. Even prior to the incident in suit, one of the plaintiffs said that it was not unusual to have more than twenty pickets in the line. Their picketing and demonstrating never bothered the officials except when they marched so close together on these narrow walks as to interfere with and obstruct the entrances to this county courthouse. The sheriff and the county attorney tried to reason with the plaintiffs and explained to them that they were blocking these entrances and they were requested to widen the gap between the marchers, but such requests were ignored and violated with impunity. There is no evidence or inference in this record from any testimony that any of these people did not understand this law, or that they were being prosecuted with the view or for the purpose of intimidating or harassing them. On the contrary, this evidence and testimony conclusively shows that these plaintiffs were being prosecuted in good faith for their willful violation of this statute because they were actually obstructing the passageways which afforded ingress and egress to this county courthouse. They were engaged in peaceful picketing prior to April 10, 1964 and were not arrested, but on and after April 10, 1964, these plaintiffs were not engaged in peaceful picketing, but were deliberately and defiantly engaged in conduct which is validly proscribed by Chapter 343, Mississippi Laws 1964.

These plaintiffs are not in this court with clean hands under the circumstances stated. The complaint in its entirety is without merit and should be dismissed.

## CONCLUSIONS OF LAW

The Court concludes as a matter of law that it has full jurisdiction of the parties and the subject matter, and has the full power and authority to do all that is herein done.

The Court further concludes as a matter of law that House Bill 546 (appearing as Chapter 343), Mississippi Laws 1964 is valid on its face and is valid as applied and enforced in this case. The Supreme Court of Mississippi has not passed upon the constitutional validity of that act, but that is not a bar under present decisions to a determination of the validity of such act, by this Court. It is noteworthy that these plaintiffs removed these prosecutions to this Court, alleging invalidity of this act on its face and as applied, and that this Court remanded these cases to the state court. The United States Court of Appeals for the Fifth Circuit in Hartfield et al. v. State of Mississippi, et al., (5CA) 363 F.2d 869, affirmed said order of remand.

This Court makes no determination as to the guilt or innocence of the plaintiffs of the charges against them for their action on these occasions, but does hold that there is abundant probable cause for such prosecutions and guilt of the plaintiffs of such charges. Said criminal actions instituted by the defendants against the plaintiffs were instituted and are maintained in perfect good faith and should not be enjoined or restrained by this Court.

The complaint is thus without merit and should be dismissed with prejudice at plaintiffs' cost. An order accordingly will be entered.

RIVES, Circuit Judge, dissenting.